Shaun Setareh (SBN 204514)
  shaun@setarehlaw.com
William M. Pao (SBN 219846)
  william@setarehlaw.com
Alexandra R. McIntosh (SBN 320904)
  alex@setarehlaw.com
SETAREH LAW GROUP
315 South Beverly Drive, Suite 315
Beverly Hills, California 90212
Telephone (310) 888-7771
Facsimile (310) 888-0109

Attorneys for Plaintiff
JAMES S. EVANS and KEINEISHA SMITH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JAMES S. EVANS and KEINEISHA SMITH, on behalf of themselves, all others similarly situated,<br><br>_Plaintiffs_,<br><br>vs.<br><br>WAL-MART STORES, INC., a Delaware corporation; and DOES 1 through 50, inclusive,<br><br>_Defendants_. | Case No. 2:17-cv-07641-AB-KKx<br><br>Assigned For All Purposes To The Honorable Andre Birotté, Jr., Courtroom 7B<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT WAL-MART STORES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:          February 28, 2019<br>Time:          10:00 a.m.<br>Place:          Courtroom 7B<br><br>Complaint Filed:     September 13, 2017<br><br>Discovery Cut-Off:     February 14, 2020<br>Pte-trial Conference:   May 1, 2020<br>Trial Date:          June 16. 2020 |

## I.    **INTRODUCTION**

Plaintiff respectfully request that Summary Judgment be granted against Defendant WAL-MART STORES, INC. ("Walmart") because it failed to pay employees at the regular rate of pay when they are earning bonuses and working overtime.  Moreover, Walmart failed to provide employees wage statements in accordance with Labor Code Section 226.[1]  If this court does not grant Plaintiff's requested relief, based upon the record presented by the parties in their respective briefs, Walmart's motion should be denied.  As to the claim that Walmart failed to pay employees at the regular rate of pay when it paid an incentive bonus, Walmart's reliance on the Division of Labor Standard Enforcement ("DLSE") Enforcement Manual is misplaced in light of *Alvarado v. Dart,* 4 Cal. 5th at 560-561, which expressly overruled the DLSE's policy providing for the method of overtime calculation as a void regulation due to DLSE's failure to adopt it in accord with the Administrative Procedure Act (APA).  *Alvarado* further held that the bonus was properly treated by dividing the amount of the bonus by the ***total number of nonovertime hours actually worked*** during the relevant pay period.

Moreover, Walmart submitted declarations that varied over time and which contradict (1) Walmart's own written discovery responses that make no mention of Walmart ever issuing paper checks and paper wage statements; (2) Walmart's own written policies produced in discovery which makes no reference to ever issuing paper checks and paper wage statements; (3) Walmart's Payment Method Selection process

---

[1] Because this Court does not permit the filing of cross motions for Summary Judgment, and after conferring with Defense Counsel according to the Local Rules, the parties decided that Walmart would file its motion with the Court and Plaintiff would request affirmative relief in his opposition.  Moreover, the parties agreed that they would submit a proposed stipulation to the Court to allow Plaintiff's counsel to file a sur-reply to Defendant's Reply in order to afford Plaintiff his due process in relation to Walmart's motion.

that all associates are required to submit that provides for the payment of wages via direct deposit, Money Network Pay Card and Money Network Check; and (4) testimony given by Walmart's Rule 30(b)(6) witness.[2]

After litigating this action for more than two years, Walmart now belatedly asserts that associates who do not enroll in one of the methods presented to associates in the Payment Method Selection Screen to receive their pay automatically receive paper checks and paper wage statements and submit a declaration to buttress this contention. However, Walmart's own discovery responses contradict this assertion and the Payment Method Selection Screen presented to associates also does not mention anything about issuing paper paychecks much less paper wage statements.  Moreover, Plaintiff has obtained declarations from current and former associates, who declare that they were informed by Walmart representatives that they would no longer be receiving paper paychecks and required to make an election to receive their wages by direct deposit, Money Network Pay Card or Money Network Check.  Walmart's own Rule 30(b)(6) witness even testified that she is not aware of how associates are informed of their options to receive their wages.

As to associates who have elected to receive their pay via one of the methods provided in the Payment Method Selection Screen, Walmart concedes that it does not provide those associates with paper wage statements and instead require them to print them out themselves in stores or to go online to view them.  Walmart argues that this practice is legally compliant and cited to the July 6, 2006 opinion letter issued by the Division of Labor Standards Enforcement (DLSE) but fails to mention that it contains six requirements – the first of which is that "[a]n employee may elect to receive paper

---

[2] Whether Walmart's declarant is credible and whether her testimony that contradicts and conflicts with verified discovery responses and written policies produced by Walmart should even be taken into consideration is clearly for jury to decide and on this basis alone, Defendant's motion should be denied.

1  wage statements at any time."  Walmart's own witness under the Federal Rules of Civil

2  Procedure 30(b)(6) testified that there is no language in the Payment Method Selection

3  Screen that would permit an associate to elect paper wage statements.

4       Because Walmart's wage statement practices do not comply with California law,

5  this Court should deny Walmart's motion for partial summary judgement as to the Wage

6  Statement claim (Count V).  Moreover, with respect to those associates who made an

7  election to receive their wages electronically, Walmart concedes that it does not provide

8  them with paper wage statements nor do associates retain any choice to elect to receive

9  paper wage statements after they make an election to receive their wages electronically.

10 Therefore, because Walmart's wage statement practices do not comply with California

11 law, Plaintiff respectfully requests that this Court grant partial summary judgment as to

12 the Wage Statement claim (Count V) in Plaintiff's favor.

13      Similarly, Walmart's motion for partial summary as to Plaintiff's claims under the

14 Labor Code Private Attorneys' General Act of 2004 ("PAGA") (Count VIII) also fails

15 because there is no requirement to pursue *class* certification of a *representative* PAGA

16 claim.  Because Plaintiff has plausibly asserted claims on behalf of the certified classes,

17 he has standing to pursue these claims.  Moreover, Plaintiff is not required, to make a

18 showing under Rule 23 as to how the PAGA claim could be manageably tried.

19      For these reasons, this Court should not only deny Walmart's motion for partial

20 summary judgment as to Counts III, V and VIII, but grant partial summary judgment as

21 to Count III and V in Plaintiff's favor.

22 **II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY**

23      Plaintiff filed this class and representative action on September 13, 2017.  In

24 pertinent part to this motion, Plaintiff asserted that Walmart did not properly comply

25 with Labor Code section 226 because it did not "furnish" pay stubs to the certified class.

26 Moreover, when putative class members earned a non-discretionary quarterly bonus and

27 worked overtime; they were not paid the regular rate of pay.

28      **A.    THE PARTIES' DISCLOSURES TO THE COURT IN THE JOINT**

**REPORT**

On April 20, 2018, the parties filed a Joint Rule 26(f) report in which they agreed to complete their initial disclosures no later than May 21, 2018. (Dkt. 23.) Notably, the parties identified both James S. Evans and Keineisha Smith as the only percipient witnesses they could identify by name. (*Id.*) At that time, Walmart also stated that each member of the putative class would be a potential witness. (*Id.*) Walmart did not identify any other witnesses likely to have discoverable information. (*Id.*) The parties also jointly identified relevant documents to include Walmart's policies applicable to the claims alleged during the operative time periods, class-wide contact information, data, time and payroll records, including but not limited to, documents relating to Plaintiff's employment and termination. (*Id.*) (Declaration of William Pao ("Pao Decl."), ¶¶ 2-4.)

**B.    PLAINTIFF'S WRITTEN DISCOVERY AND DEFENDANT'S RESPONSES**

On April 20, 2018, Plaintiffs propounded written discovery on Walmart consisting of: Interrogatories (Sets One and Two), Request for Production of Documents (Set One), and Request for Admissions (Set One). (Pao Decl., ¶ 6.)

On June 21, 2018, Walmart responded to Request for Admissions (Set One) and Interrogatories (Sets One and Two). (Pao Decl., ¶¶ 7, Ex. 1; 8, Ex. 2.)  Walmart's responses to Interrogatories (Sets One and Two) were verified on September 4, 2018 by Todd Stokes, Walmart's Regional HR Director. (Pao Decl., ¶ 10, Ex. 4.)  Mr. Stokes was never identified by Walmart as it never served its Rule 26 disclosures nor did they ever supplement that disclosure. (Pao Decl., ¶¶ 2-5.)  On July 16, 2018, Walmart responded to the Request for Production of Documents (Set One). (Pao Decl., ¶ 9, Ex. 3.)

Plaintiff's Interrogatory No. 19 requested that Walmart describe how it provided wage statements to Plaintiff and putative class members.

**Interrogatory No. 19:**
Please describe with as much specificity as possible how YOU provided a detachable part of the check, draft, or voucher paying PLAINTIFF or POTENTIAL CLASS MEMBERS wages.
**Response to Interrogatory No. 19:**
[Objections omitted.]
All active Walmart associates with WINs may access their bi-weekly pay stub

1   through various online portals, including through the WIRE, Walmartone, or
2   through moneynetwork.com.  All terminated Walmart associates who previously
    had WINs may access their paystubs via moneynetwork.com.

3   (Pao Decl., ¶ 7, Ex. 1.)  According to their written discovery response the exclusive

4   method for an employee to receive paystubs is through electronic means.  Walmart did

5   not assert any other policy or practice other than the foregoing discovery response.  (*Id.*)

6   Moreover, Walmart never expressed that the default policy was to issue a paper

7   paycheck along with a paper wage statement. (*Id.*)  Nor could it since none of the

8   documents they produced in discovery ever mentions it. (Pao Decl., ¶¶ 11-12.)

9        Plaintiff's Request for Production No. 16 requested that Walmart produce

10  documents explaining how Plaintiff and putative class members received their wage

11  statements. In response to Plaintiff's request for Walmart's wage statement policies,

12  Walmart produced documents in relation to how employees can access the Payment

13  Method Selection Screen which includes how employees could potentially access their

14  wage statements. (Pao Decl., ¶¶ 9, Ex. 3; 14, Ex. 6.)  In pertinent part, the Payment

15  Method Selection Screen provides for the following:

16       •   I elect to use direct deposit to receive my pay.  When selecting this option,
             you may utilize as many as two checking and two savings accounts.  Enter
17           your bank routing number and account number for each desired account on
             the next screen.
18       •   I elect to use the Money Network™ pay distribution service.
             Enter the Money Network Service information found in your card packet
19           on the next screen.
             A. Money Network Mastercard ® Paycard – An easy, safe, and convenient
20              way to receive your pay.  You can use your card to access your money
                anytime at participating ATMs and everywhere debit Mastercard is
21              accepted.
             B. Money Network Check – A self-issued pay check that can be completed
22              each payday morning for your exact amount of net pay.  It is completed
                by phone and can be cashed at any Walmart store.
23       •   I elect to use both direct deposit and Money Network™ pay distribution
             Service to receive my pay.
24  (*Id.*)  Not a single one of the documents that Walmart produced states that associates

25  shall receive physical payroll checks with paper wage statements unless they sign up for

26  another option; nor is there any policy that states that paper wage statements is the

27  default policy. (Pao Decl., ¶¶ 11-12.)  Moreover, Walmart had multiple opportunities to

28  elaborate how wage statements were provided to Plaintiff and putative class members.

1    For example, Plaintiff's Interrogatory No. 10 also requested information as to how

2 Plaintiff and other putative class members were paid for all hours worked. Again,

3 Walmart's response does not state that associates received physical payroll checks with

4 paper wage statements unless they signed up for another option; nor do any of the

5 documents that Walmart refers to in its response state that this was the default policy.

6 (Pao Decl., ¶ 7, Ex. 1.)

7       **C.    WALMART'S EVIDENCE IN OPPOSITION TO DEFENDANT'S**

8                **MOTION FOR CLASS CERTIFICATION AND RULE 30(B)(6) DEPOSITION TESTIMONY FROM DIANA MCCRISTIAN**

9       On September 3, 2019, Walmart filed its opposition to Plaintiff's motion for class

10 certification. In support of its opposition, Walmart submitted the declaration of Diana

11 McChristian who is a Senior Director, Payroll Global Business Services and who held

12 that position since 2012. (Dkt. 109-2, ¶ 2.)

13       In pertinent part, Ms. McChristian's declaration is remarkable for the assertions

14 that it makes which contradict (1) Walmart's own written discovery responses that make

15 no mention of Walmart ever issuing paper checks and paper wage statements; (2)

16 Walmart's own written policies produced in discovery which makes no reference to ever

17 issuing paper checks and paper wage statements; and (3) Walmart's Payment Method

18 Selection process that all associates are required to submit that provides for the payment

19 of wages via direct deposit, Money Network Pay Card and Money Network Check. (Pao

20 Decl., ¶¶ 7, Ex. 1; 8, Ex. 1; 9, Ex. 1; 11-12, 14.) For example, Ms. McChristian stated

21 that "Associates who do not select one of these two options are paid via a paper check

22 and receive a paper paystub with that paper check." (Dkt. 64-1, ¶ 11.) But this is not

23 mentioned anywhere in Walmart's written discovery responses nor in any of the policies

24 that it produced during discovery. (Pao Decl., ¶¶ 7, Ex. 1; 8, Ex. 1; 9, Ex. 1; 11-12, 14.)

25 Moreover, Walmart never identified Ms. McChristian as Walmart never served its initial

26 disclosures (nor did they supplement their disclosures at any time thereafter) and never

27 identified her in response to Plaintiff's Interrogatory No. 20 seeking the identity of all

28 persons who have knowledge of the facts to support Walmart's denial to Plaintiff's

Request for Admissions No. 8.[3] (Pao Decl., ¶¶ 2-5; 7, Ex. 1.)

On January 24, 2020, Walmart filed its motion for partial summary judgment and submitted a new declaration from Ms. McChristian. (Dkt. 109, 109-2.)  This new declaration makes sweeping conclusions that are contradicted by (1) Walmart's own written discovery responses that make no mention of Walmart ever issuing paper checks and paper wage statements; (2) Walmart's own written policies produced in discovery which makes no reference to ever issuing paper checks and paper wage statements; and (3) Walmart's Payment Method Selection process that all associates are required to submit that provides for the payment of wages via direct deposit, Money Network Pay Card and Money Network Check. (Pao Decl., ¶¶ 7, Ex. 1; 8, Ex. 1; 9, Ex. 1; 11-12, 14.) For example, Ms. McChristian's declaration boldly states that "associates received live, physical payroll checks with a paper wage statements attached unless they signed up for another option" but also goes so far as to state that "[t]his was and is the default." (Dkt 109-2, ¶ 6.)  But again, nowhere in Walmart's written discovery responses, or the Payment Method Selection Screen, or in any of the policies produced by Walmart in discovery, is this purported policy mentioned at all. (Pao Decl., ¶¶ 7, Ex. 1; 9, Ex. 3; 11-12, 14.)

On February 4, 2020, Ms. McChristian was produced as Walmart's Rule 30(b)(6) witness in connection with this matter.  In pertinent part she testified as follows:

> Q    Can you identify any documents that Walmart produced in connection with this litigation that specifically states that the default rule is for people to receive paper stubs unless they elect to received payment in another fashion?
> MR. HERRINGTON:    Objection to form.  It was kind of garbled as it came through.  You can answer if you understand.
> A    No, I can't identify any documents that specifically state that.

---

[3] Request for Admission No. 8: Admit that YOU did not provide Plaintiff and POTENTIAL CLASS MEMBERS with accurate written wage statements in accordance with California law DURING THE RELEVANT TIME PERIOD. (Pao Decl., ¶ 7, Ex. 2.)

7

1  (Pao Decl., ¶ 13, Ex. 5, TR 61:4-13.)  Furthermore, Ms. McChristian's testimony even

2  explains what constitutes a Walmart policy.

> Q     I'm having a hard time understanding the difference between a policy and informational information that you've described.  Can you please explain the difference?
>
> A     Yes.  So a policy in Walmart's world will say policy; PTO policy, benefit policy.  The word policy typically will be used, and it will be presented as a policy; here are the rules, here's what's going to happen, here's what you should or have to do.  Like our work off the clock policy, our policy is associates don't work off the clock.
>
> The payment selection documents that we've talked about today and I've reviewed are not policies.  They are informational.  I go into the system and what I see is here's some information on how to use this system.  Here are your options if you're in this system and you want to make a choice.  That would be instructional.  We do not – Walmart does not have a direct deposit policy or ACH policy or electronic payment policy.  There is no policy affiliated with the associate's choice to receive their payroll payment through electronic means.

(Pao Decl., ¶ 13, Ex. 5, TR 63:17-64:12.)

**D.    WALMART'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MS. MCCHRISTIAN'S NEW DECLARATION AND DEPOSITION TESTIMONY**

Despite Ms. McChristian's deposition testimony explaining that if something is a "Walmart policy", it would have to (1) have the word 'policy' explicitly stated on it <u>and</u> (2) "identify[] the rules, what's going to happen, what you should or have to do," Ms. McChristian's latest declaration completely ignores her prior testimony and attempts to characterize its wage statement practice as a 'policy' and being "Walmart's California associates receive a live, physical payroll check with a paper wage statement attached unless they affirmatively sign up for another option[,]." However, there is no express policy stating that this is Walmart's policy. There is only Ms. McChristian's self-serving declaration. (Dkt. 109, at 3:24-26; Pao Decl., ¶ 13, Ex. 5, TR 61:4-13; 63:17-64:12.)

Ms. McChristian also testified:

- 96% of Walmart's employees have elected to receive their wages electronically (Pao Decl., ¶ 13, Ex. 5, TR 64:13-66:1);
- Walmart has around 15 people that are distributing the paper payroll checks (*Id.*, TR 66:5-11);
- By its associates electing to receive their wages electronically, Walmart saves incrementally associated with printing more checks (*Id.*, TR 68:12-20);
- Walmart incurs labor costs to organize and distribute payroll checks (*Id.*,

TR 68:21-69:6)

Moreover, by not furnishing paper wage statements, Walmart is foisting costs upon its associates who have to devote time and resources to obtain a copy of their wage statements. These costs necessarily include: (1) the time spent accessing the wage statements online at walmartone.com or moneynetwork.com or printing them out in-store at an FD-300 machine; (2) printing costs if they were to print the wage statements outside of Walmart; (3) costs associates incur with maintaining a cell phone if associates were to view their wage statements using their mobile cell phones; (4) costs associates incur with maintaining a computer if they were to view the wage statements online using their own home computers. Walmart's Rule 30(b)(6) witness testified that these costs are not reimbursed by Walmart in any way, shape or form. (*Id.*, TR 30:3-6.; Evans Decl., ¶¶ 12-15.)

### E. TESTIMONY FROM PLAINTIFF AND PUTATIVE CLASS MEMBERS PERTAINING DEFENDANT'S POLICIES AND PRACTICES

Plaintiff's declaration submitted with this Opposition disputes Walmart's contention that associates were not required to enroll in one of the electronic options to receive their wages. During his onboarding process, Plaintiff was directed to enroll in one of the payment options provided in the Payment Method Selection Screen. (Declaration of James S. Evans "Evans Decl.," ¶ 9.; Declaration of Denzel Watson ("Watson Decl."), ¶¶ 4-5; Declaration of Joaquin Sedillo ("Sedillo Decl."), ¶¶ 4-5; Declaration of Kole Scully-Mims ("Scully-Mims Decl."), ¶¶ 4-5.) None of these options permitted Plaintiff to elect to receive paper wage statements. (*Id.*) Plaintiff was not provided with any other option to receive paper wage statements from Walmart. (*Id.*) In order to obtain his wage statements, Plaintiff had to view it electronically. (Evans Decl., ¶ 10.) Although there were computers located at Walmart to view and print his wage statements, Plaintiff could not view or print them during his meal periods or at any time when he was not on the clock. (*Id.*) Moreover, Plaintiff's supervisor would not permit him to take a break to view his wage statements. (Evans Decl., ¶ 11.) This meant

1   that the only time Plaintiff was able to view his wage statements and/or print a paper

2   copy while at work was when he was on his statutorily mandated rest periods. (*Id.*)

3         On several occasions, Plaintiff used his personal cellphone to access his wage

4   statements. (Evans Decl., ¶ 12.)  He also was forced to travel to the library on several

5   occasions to print his wage statements for a fee. Walmart did not reimburse Plaintiff for

6   his time and/or expense incurred in obtaining his wage statements. (Pao Decl., ¶ 30, Ex.

7   5, TR 30:3-13; Evans Decl., ¶¶ 12-15.)

8   **III.**   **ARGUMENT**

9       **A.**   **THE DECLARATION AND TESTIMONY OF DIANA**

10            **MCCHRISTIAN IS TANTAMOUNT TO A SHAM AFFIDAVIT AND SHOULD NOT BE GIVEN ANY OR SIGNIFICANT**

11            **DEFERENCE**

12         The *Foster-Radobenko* rule states that a party should not be able to substitute an

13   affidavit alleging helpful facts for earlier deposition testimony harmful to its case in

14   order to avoid summary judgment. *Foster v. Arcata Assocs*, Inc., 772 F.2d 1453, 1462

15   (9th Cir. 1985), *Radobenko v. Automated Equipment Corp*., 520 F.2d 540, 544 (9th Cir.

16   1975) "The *Foster-Radobenko* rule applies to conflicts between affidavits and

17   interrogatory responses as well as deposition testimony…" *School Dist. No. 1J,*

18   *Multnomah County, Or. V. ACandS, Inc.*, 5 F.3d 1255, 1264.  The *Foster Radobenko*

19   rule does not automatically dispose of every case in which a contradictory affidavit is

20   introduced to explain portions of earlier deposition testimony.' *Kennedy v. Allied Mut.*

21   *Ins. Co*., 952 F.2d 262, 266 (9th Cir.1991). The district court must make a finding of fact

22   that the affidavit was a 'sham.' (*Id.*)  A party cannot create an issue of fact by submitting

23   an affidavit that contradicts party's own deposition testimony. *Nelson v. City of Davis,*

24   571 F.3d 924 (9th Cir. 2009) (The "rationale underlying the sham affidavit rule is that a

25   party ought not be allowed to manufacture a bogus dispute with himself to defeat

26   summary judgment.")

27         Here, the declarations of Diana McChristian conflict and contradict (1) Walmart's

28   own written discovery responses that make no mention of Walmart ever issuing paper

checks and paper wage statements; (2) Walmart's own written policies produced in discovery which makes no reference to ever issuing paper checks and paper wage statements; and (3) Walmart's Payment Method Selection process that all associates are required to submit that provides for the payment of wages via direct deposit, Money Network Pay Card and Money Network Check. (Pao Decl., ¶¶ 7, Ex. 1; 8, Ex. 1; 9, Ex. 1; 11-12, 14.)  Ms. McChristian's declarations even contradict her own deposition testimony and therefore, should not be given any deference. (Pao Decl., ¶ 13, Ex. 5, TR 61:4-13; 63:17-64:12.)

### B.      STANDARD FOR SUMMARY JUDGMENT

Plaintiff respectfully requests for this Court to grant Summary Judgment in Plaintiff's favor because Defendant failed to pay Plaintiff and the putative class overtime based upon the regular rate of pay and their failure to comply with Labor Code 226 because they fail to "furnish" pay stubs to the certified class.  As will be demonstrated herein below; Defendant failed to calculate Plaintiff and the putative class's overtime rate correctly when they were paid bonuses.  This claim is predicated upon the law which is clear (based upon California Supreme Court authority and is not disputed by either side) and the fact that the claim is predicted upon a mathematical calculation.

As to the wage statement claim; Plaintiff respectfully posits that it has satisfied under the applicable 9th Circuit standards set forth below that Defendant willfully did not comply with Labor Code 226 and caused injury to Plaintiff and the class.  At a minimum; Plaintiff asserts that weighing the evidence in this case in the light most favorable to the non-moving party; Defendant's motion should be denied.

To grant summary judgment, the court must find there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  This requires the moving party to establish beyond controversy every essential element of its claim or defense: "If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim

or defense to warrant judgment in his favor." *E.g.*, *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

The court must view the evidence presented in the light most favorable to the *opposing* party: "*The evidence of the non-movant is to be believed*, and a*ll justifiable inferences are to be drawn in his favor*." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255 (emphasis added). In addition, at the summary judgment stage, the nonmovant's version of any disputed issue of fact is presumed correct. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).  Even where the basic facts are undisputed, *if reasonable minds could differ* on the inferences to be drawn from those facts, summary judgment should be denied. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 875 (9th Cir. 1987).

Summary judgment cannot be granted where the opposing party's evidence or reasonable inferences from such evidence raise a "genuine dispute" as to any "material" fact shown by the moving party. Thus, where words or conduct may be interpreted in several ways, one supporting the motion and one controverting it, summary judgment must be denied. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

**C.   WALMART MUST PROVIDE LAWFUL WAGE STATEMENTS TO ALL EMPLOYEES, INCLUDING THOSE WHO ELECT TO RECEIVE THEIR WAGES VIA DIRECT DEPOSIT OR MONEY NETWORK**

   **1.   <u>Wal-Mart Only Offers Three Options For Employees to Receive Their Pay.</u>**

After litigating this action for more than two years, Walmart now belatedly asserts, for the first time, that associates receive physical paper checks with paper wage statements unless they sign up for another option. This self-serving declaration is inadmissible because it (1) is from an individual that was never identified by Walmart in its Rule 26 disclosure and (2) contradicts its own prior verified discovery responses as well as the documents that it produced in discovery. (Pao Decl., ¶¶ 7, Ex. 1; 8, Ex. 1; 9,

Ex. 1; 11-12; 14, Ex. 5.)  A party who fails to make the required initial disclosure "is *not allowed* to use that information or witness to supply evidence on a motion, at a hearing, or at trial…" *Hoffman v. Construction Protective Services, Inc.*, 541 F. 3d 1175, 1179 (9th Cir. 2008).  Additionally, Walmart failed to identify Ms. McChristian as a witness in response to Interrogatory No. 20 requesting that it identify "all persons who have knowledge about the claims or defenses to the action…" (Pao Decl., ¶ 7, Ex. 1.)

Furthermore, at stated, Ms. McChristian's self-serving declaration is contradictory to prior testimony. Initially, when Walmart opposed Plaintiff's motion for class certification, it submitted Ms. McChristian's declaration which stated that "Associates who do not select one of these two options are paid via a paper check and receive a paper paystub with that paper check." (Dkt. 64-1, ¶ 11.)[5]  Now, in support of its motion for partial summary judgment, Walmart submitted Ms. McChristian's markedly changed declaration which states "In California, during the period Mr. Evans worked for Walmart, associates received live, physical payroll checks with paper wage statements unless they signed up for another option.  This was and is the default." (Dkt. 109-2, ¶ 6.)

Ms. McChristian's declaration is contradicted by Walmart's own written discovery responses that make no mention of Walmart ever issuing paper checks and paper wage statements; Walmart's own written policies produced in discovery which makes no reference to ever issuing paper checks and paper wage statements; Walmart's Payment Method Selection process that all associates are required to submit that provides for the payment of wages via direct deposit, Money Network Pay Card and

---

[5] However, in reality, Walmart actively encourages associates to select one of the methods in the Payment Method Selection Screen presented to associates.[5] (Declaration of Denzel Watson ("Watson Decl."), ¶¶ 4-5; Sedillo Decl., ¶¶ 4-5; Scully-Mims Decl., ¶¶ 4-5.)  Further, there is no mention in the Payment Method Selection Screen (or for that matter, anywhere else) that associates may receive their wages in the form of a physical paper check and Walmart's own Rule 30(b)(6) witness testified that there is no such written policy. ((Pao Decl., ¶¶ 7, Ex. 1; 8, Ex. 1; 9, Ex. 1; 11-12; 14, Ex. 5, ¶ 13, Ex. 4, TR 61:4-13.)

1    Money Network Check; and Ms. McChristian's own deposition testimony. (Pao Decl.,

2    ¶¶ 7, Ex. 1; 8, Ex. 1; 9, Ex. 1; 11-12, 13, Ex. 4, TR 61:4-13, 63:17-64:12; 14, Ex. 5.)

3            On June 21, 2018, Walmart served written responses to Interrogatory No. 19

4    (among others) and stated the following:

5    **Interrogatory No. 19:**
     Please describe with as much specificity as possible how YOU provided a

6    detachable part of the check, draft, or voucher paying PLAINTIFF or
     POTENTIAL CLASS MEMBERS wages.

7    **Response to Interrogatory No. 19:**
     [Objections omitted.]

8    Subject to and without waiver of the foregoing objections, Defendant responds as
     follows: Defendant is willing to meet and confer with Plaintiffs to regarding the

9    scope and nature of the information sought in this Interrogatory.  All active
     Walmart associates with WINs may access their bi-weekly pay stub through

10   various online portals, including through the WIRE, Walmartone, or through
     moneynetwork.com.  All terminated Walmart associates who previously had

11   WINs may access their paystubs via moneynetwork.com.

12   (Pao Decl., ¶ 7, Ex. 1.)  There is absolutely no mention that Walmart pays associates via

13   a paper check and that associates receive paper wage statements with that paper check.

14   Neither does this response describe any situations under which Walmart would pay its

15   associates via a paper check and that associates receive paper wage statements with that

16   paper check. (*Id*.)

17           Moreover, Walmart's Payment Method Selection process requires associates to

18   enroll in one of the options to receive his or her pay. (Pao Decl., ¶ 14, Ex. 5.)  The only

19   options are: (1) direct deposit into a bank account; (2) Money Network Mastercard

20   Paycard; (3) Money Network Check; or (4) a combination of the above. (*Id*.)  Nowhere

21   does it state that if an associate does not select one of these options, that Walmart will

22   issue a paper check along with a paper paystub. (*Id*.)  Moreover, Ms. McChristian's

23   deposition testimony confirms this:

24   Q    Can you identify any documents that Walmart produced in connection with
          this litigation that specifically states that the default rule is for people to

25        receive paper stubs unless they elect to received payment in another

26        fashion?

27   MR. HERRINGTON:       Objection to form.  It was kind of garbled as it came
          through.  You can answer if you understand.

28   A    No, I can't identify any documents that specifically state that.

(Pao Decl., ¶ 13, TR 61:4-13.)

**2.** **Labor Code Section 226(a) Requires Walmart to Actually Give Associates a Written Wage Statement**

First, with respect to associates who elect to receive their wages under one of the methods in the Payment Selection Method, Walmart contends that it complied with California law because it made available to associates the ability to view and print wage statements. But Labor Code section 226(a) requires "[a]n employer, semimonthly or at the time of each payment of wages, ***shall furnish to his or her employee***, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash, an accurate itemized statement in writing …" By only making wage statements available for the employees, Walmart fails to meet the requirement to *furnish* employees with wage statements.

In construing a statute, "'we look first to its language, giving the words used their ordinary meaning.'" *Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Compensation Programs*, 519 U.S. 248, 255 (1997) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990); *Hsu v. Abbara,* 9 Cal. 4th 863, 871 (1995). Statutory language, however, "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989). But if the statutory language is clear and unambiguous our inquiry ends. *People v. Snook,* 16 Cal. 4th 1210, 1215 (1997).

"[S]tatutes governing conditions of employment are to be construed broadly in favor of protecting employees." *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal. 4th 1094, 1103 (2007). As Labor Code section 226 governs conditions of employment, it should be construed broadly in favor of protecting employees. *California Manufacturers Assn. v. Industrial Welfare Com.*, 109 Cal. App. 3d 95, 112-113 (1980) ("The trial court found "that employee welfare does require that wage data be furnished …to help the employee in… dealings with the IRS and FTB (and) so that time disputes (between

1  employer and employees) might be more readily resolved.")

2  The Merriam-Webster dictionary defines the word "furnish" as "to provide with

3  what is needed" or "supply, give."[7] The act of giving someone something is very

4  different than the act of telling someone where they can get something. The Division of

5  Labor Standards Enforcement issued an opinion letter on November 10, 1998 addressing

6  this exact issue before this Court. (Request for Judicial Notice ("RJN"), ¶ 1, Ex. 1.) In

7  the opinion letter, the DLSE opined that even if an employee elects to receive his or her

8  pay by direct deposit, the employee is still entitled to a hard copy wage statement. (*Id.*)

9  Notably, this opinion letter also states that it recently forwarded a letter to the

10  department's legislative unit for possible future legislation in this area to update the

11  Labor Code. (*Id.*)  Since this opinion letter was issued in 1998, Labor Code section 226

12  has been amended a total of twelve times.[8]  None of these amendments altered the

13  requirement that an employer "shall furnish to his or her employee, either as a detachable

14  part of the check, draft, or voucher paying the employee's wages, or separately if wages

15  are paid by personal check or cash…" (*see* f.n. 2, *supra.*)  In a subsequent opinion letter

16  issued on July 6, 2006, in response to an inquiry whether an employer met its legal

17  obligation under Labor Code section 226(a) by furnishing a wage statement in electronic

18  form, the DLSE opined that furnishing an electronic wage statement complies with

19  Section 226(a) so long as six factors are met – with the first factor being "An employee

20  may elect to receive paper wage statements at any time." (RJN, ¶ 2, Ex. 2.)

21  Moreover, the primary California authority on electronic wage statements allows

22  for electronic wage statements "so long as each employee ***retains*** the right to ***elect*** to

23  _____

24  [7] "furnish." *Merriam-Webster.com* 2011. https://www.merriam-webster.com (8

25  May 2011).

26  [8] Since 1998, Labor Code section 226 was amended in 2000 (A.B. 2509), 2002
(A.B. 2412), 2003 (A.B. 276), 2004 (S.B. 1618), 2005 (S.B. 101), 2005 (A.B. 469),

27  2011 (A.B. 243), 2012 (A.B. 2674), 2012 (S.B. 1255), 2012 (A.B. 1744), 2016 (A.B.

28  2535), 2017 (S.B. 1252).

receive a written paper stub or record[.]" *Derum v. Sakes & Co.,* 95 F. Supp. 3d 1221, 1226-1227 (S.D. Cal. 2015) (quoting DLSE Opinion Letter No. 2006.07.06 at 2-3, emphasis added.) California law thus puts the onus on the employer to ensure that employees are given the option to elect traditional hardcopy statements within the context in which the electronic wage statements were first imposed, ***without forcing the employees, as Walmart is doing here, to give up direct deposit***.

In another case that addressed electronic wage statements, *Apodaca v. Costco Wholesale Corp.*, 2012 WL 12336225 (C.D. Cal. 2012), the defendant retailer had set up a system by which employees could access their wage statements electronically via "telephone, internet and intranet," with a computer and printer available in the break room and the option to have a payroll clerk print a wage statement upon request. (*Id.* at *1.) In ruling on defendant's motion for summary judgment, the court relied on the DLSE's 2006 opinion letter as "persuasive" authority and found genuine issues of material fact as to whether plaintiff could "easily access" her wage statements and easily convert them to print. (*Id.* at *2.)  In

In this case, Plaintiffs contend that Walmart failed to comply with Labor Code section 226 because it failed furnish employees with paper wage statements when they elected to receive their wages by direct deposit, Money Network Pay Card and/or Money Network Check. Instead, as Walmart concedes, it only makes available wage statements for employees to access.  Walmart relies on the deposition testimony of Plaintiff Evans that to support the contention that it made available to all associates multiple avenues for viewing and printing wage statements. However, none of this is relevant because, as a statute that governs the health and welfare of workers, the statute mandates that employers, like Walmart, actually give employees a hard copy of their wage statements. (*Id.*)

### 3.   <u>Walmart's Failure to Provide Paper Wage Statements Was Knowing and Intentional</u>

Admittedly, there is a dearth of statutory, regulatory, and case law guidance as to

the metes and bounds of a good faith dispute as applied to Cal. Lab. Code § 226. *See, e.g., Wright*, 2013 WL 1758815, at *10 ("[T]he legal issue is a close one, and there is no judicial precedence providing clear guidance on the scope of the [good faith] exemption [under § 226] at issue."). However, Cal. Lab. Code § 203 's good faith dispute does not face the same lack of interpretive guidance as § 226. § 203 's good faith dispute, which applies to § 226 's good faith dispute, *see, e.g., Pedroza v. PetSmart, Inc.*, 2012 WL 9506073, at *5 n.6 (C.D. Cal. June 14, 2012) (holding that § 203 's " 'good faith dispute' defense also applies to Labor Code § 226(e)"), has clear and abundant guidance. Both case law and a regulation, Cal. Code Regs. tit. 8 § 13520, set forth the particularities of a good faith dispute under Cal. Lab. Code § 203.

As a result, many courts rely on § 203 's good faith dispute for guidance on how to interpret § 226 's good faith dispute. *See, e.g., Dalton*, 2011 WL 1045107, at *5 (citing Cal. Code Regs. tit. 8 § 13520, the regulation interpreting the § 203 good faith dispute, in considering a good faith dispute under § 226); *Wright*, 2013 WL 1758815, at *9 (same); *Pedroza v. PetSmart, Inc.*, 2012 WL 9506073, at *5 n.6 (C.D. Cal. June 14, 2012) ("Although [Cal. Code Regs. tit. 8] § 13520 only expressly refers to California Labor Code § 203, the 'good faith dispute' defense also applies with respect to Labor Code § 226(e).").

The regulation for a good faith dispute under § 203, Cal. Code Regs. tit. 8 § 13520, provides as follows:

> A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover[y] on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.'

As interpreted by the case law, a good faith dispute presents in the § 203 context when there is "(1) uncertainty in the law, (2) representations by [an]...authority that no further payment [of wages] was required, or (3) the employer's good faith mistaken belief that wages are not owed grounded in a good faith dispute, which exists when the employer

1   presents a defense based in law or fact which, if successful, would preclude any recovery

2   on the part of the employee." *Diaz v. Grill Concepts Servs., Inc.*, 23 Cal. App. 5th 859,

3   868, 233 Cal.Rptr.3d 524 (2018)(internal citations and quotation marks omitted).

4       Wal-Mart relies on prongs (2) and (3) of *Diaz*—that there were representations by

5   the DLSE as to how to calculate the regular rate of pay, and that it had a good faith

6   mistaken belief that the electronic wage statements complied with § 226(a). However,

7   Walmart's failure to provide paper wage statements to associates who elected to receive

8   their wages via direct deposit, Money Network Pay Card and/or Money Network check

9   was both knowing and intentional because it ignored DLSE guidance and was not

10  consistent with the statute's plain language.

11      First, as explained above, the DLSE's July 6, 2006 opinion letter is predicated

12  upon the employer satisfying six requirements – the first of which being "An employee

13  may elect to receive paper wage statements at any time." (RJN, ¶ 2, Ex. 2.)  Yet this

14  option is not provided to Walmart's associates.  Moreover, Walmart's Rule 30(b)(6)

15  witness testified that there is no language in the Payment Method Selection Screen that

16  would permit an employee to elect to receive paper wage statements at any time, without

17  forcing the employee to give up direct deposit. *Derum*, *supra,* 95 F. Supp. 3d at 1226-

18  1227.

19  Q    Okay.  Regardless of the method chosen by an employee, are they provided with a paper wage statement?

20  A    If an associate chooses to have electronic pay, they are not provided with a paper wage corporate wage statement.  They have several means in which

21       they can obtain a paper wage statement.

22  Q    How would they get their paper wages statement under those circumstances?

23  A    If an associate has chosen direct deposit for their method of receiving their payroll payment, there is an electronic wage statement submitted two days

24       after a pay period ending every payroll prior to payday.  An associate can get to that statement from the field location, and I will say that and prior

25       statements up to most current from field location, which they can log onto One Walmart and get into the paystub application and print if they choose.

26       They can do that same thing through One Walmart from any location where they might be on any computer that they choose to be on or

27       they can print a paper statement in its entirety on an FD-300 machine where they have to login with secure information and they can get their

28       most recent pay statement in paper as well as the one immediately before

19

that.
(McChristian TR, 27:4-28:2.)

> Q    When an employee elects to receive their pay electronically, do you know if that election documents or process has language that says they are electing to receive their wage statements also electronically?

A    I actually don't know.  I don't see it in there.
(McChristian TR, 31:12-16.)

Thus, contrary to Walmart's assertions, its failure to provide paper wage statements ignores DLSE guidance, statutory plain language and legal precedent.  For these reasons, Walmart's motion for partial summary judgment should be denied.

### D.   PLAINTIFF IS NOT REQUIRED TO PURSUE CLASS CERTIFICATION OF REPRESENTATIVE PAGA CLAIM, HAS STANDING TO PURSUE A PAGA CLAIM, AND IS NOT REQUIRED TO PROVIDE A TRIAL PLAN

#### 1.   Claims Under PAGA Are Not Subject to Federal Class Certification Rules

The majority of federal courts that have addressed this issue have found that "representative PAGA claims need not be certified under Rule 23 to proceed." *Gallardo v. AT&T Mobility, LLC*, 937 F. Supp. 2d 1128, 1137 (N.D. Cal. 2013) (collecting cases); *see also Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 804-806, 2015 WL 4274990, *13 (N.D. Cal. 2015).  Moreover, in *Bauman v. Chase Inv. Services Corp.*, 747 F. 3d 1117, *cert. denied*, 574 U.S. 1060 (2014), the Ninth Circuit considered whether PAGA actions are sufficiently similar to Rule 23 class actions to trigger Class Action Fairness Act ("CAFA") jurisdiction and found that because a "PAGA suit is fundamentally different than a class action[,]" *id.* at 1123 (internal quotation marks omitted), "PAGA actions are also not sufficiently similar to Rule 23 class actions to trigger CAFA jurisdiction." *Id.* at 1122, 1124 (further finding that "Rule 23 and PAGA are more dissimilar than alike").

Using similar reasoning, before and after *Baumann*, federal district courts in California "have routinely held that 'PAGA actions, though representative, need not be brought as class actions under Rule 23.'" *Achal*, 114 F. Supp. 3d at 806, 2015 WL 4274990, *13, *citing Willner v. Manpower Inc.*, 35 F. Supp. 3d 1116, 1135 (N.D. Cal. 2014) ("[T]he vast majority of courts in this district… have held that representative

PAGA claims need not be certified under Rule 23 to proceed[.]"); *see also Plaisted v. Dress Barn, Inc.*, 2012 WL 4356158, *1 (C.D. Cal. 2012) ("[T]he majority of federal courts facing these claims have relied heavily on PAGA's purpose as a law-enforcement mechanism…and held that PAGA actions, though representative, need not be brought as class actions in which  Rule 23's requirements are necessarily applicable.").

For these reasons, this Court should reject Walmart's motion for partial summary judgment as to Plaintiff's PAGA claim.  In addition, to the extent Walmart's argument that Plaintiff lacks standing to bring PAGA claims is based on his failure to obtain class certification, it should likewise be rejected by this Court.

### 2.    Claims Under PAGA Are Not Required to Comply With Rule 23 Manageability Requirements

For the same reasons that PAGA claims do not need to satisfy federal class action requirements, PAGA claims are not required to comply with Rule 23 manageability requirements. *See, e.g.*, *Plaisted*, 2012 WL 4356158, at *2. The purpose of PAGA "is to incentivize private parties to recover civil penalties for the government that otherwise may not have been assessed and collected by overburdened state enforcement agencies." *Ochoa-Hernandez v. Cjaders Foods, Inc.*, 2010 WL 1340777, *4 (N.D. Cal. 2010). Holding that individualized liability determinations make representative PAGA actions unmanageable, and therefore untenable, would impose a barrier on such actions that the state law enforcement agency does not face when it litigates those cases itself. *Cf. Iskanian v. CLS Transportation Los Angeles, LLC,* 59 Cal. 4th 348; *Arias v. Superior Court*, 46 Cal. 4th 696, 923.  Imposing such a requirement, found nowhere in PAGA itself and apparently not imposed upon the government, would "obliterate [the] purpose" of representative PAGA actions. *See Plaisted*, 2012 WL 4356158, at *2; *see also Kemah Henderson v. JPMorgan Chase Bank,* Case No. CV 11–3428 PSG at *9–10 (C.D. Cal. July 10, 2013); *cf., Hibbs–Rines,* 2009 WL 513496, at *4).

### E.    BASED ON THE DATA PROVIDED IN WALMART'S MOTION, WHICH WAS NOT PREVIOUSLY MADE AVAILABLE TO PLAINTIFF, THE CALCULATIONS SHOW ON ITS FACE THAT

## WALMART DID NOT PROPERLY CALCULATE THE REGULAR RATE OF PAY

Under existing California law, the proper way to calculate the regular rate of pay is to first add up all the wages for work performed.  Once the total amount of compensation is determined, this amount is then divided by total straight time hours (rather than the total number of hours worked). *Alvardo v. Dart Container of California,* 4 Cal. 5th 542 (2018).  The resulting number is then multiplied by 1.5 to obtain the "overtime differential."  This overtime differential is then multiplied by the total number of overtime hours worked, which is the additional amount that is supposed to be paid to the employee. (*Id.*)

Pursuant to Defendant's procedures and practices, Evans and putative class members who worked overtime and were paid a non-discretionary bonus were not paid overtime wages at the correct regular rate of pay.  Walmart relies on the DLSE Enforcement Manual to calculate the regular rate of pay for bonuses that it paid out under its Myshare Quarterly Incentive Plan ("Myshare Plan") to associates who work at Walmart retail stores, supercenters, and/or neighborhood markets in California. (Dkt. 109, at 5:4-8:3.)  Under this DLSE guidance, Walmart asserts that the regular bonus rate is found by dividing the bonus by the total hours worked during the period to which the bonus applies.  The total hours worked for this purpose will be all hours, ***including overtime hours***." (*Id.* at 5:10-12.)  Walmart then goes on to state that it fully complied with this guidance and states, among other things, that:

- The Weekly Incentive Amount was divided by the hours the associate worked during the week up to a maximum of 40 hours (***thus weekly overtime hours are not included in the denominator***), which resulted in an "Additional Regular Rate." (*Id.* at 5:18-21) (emphasis added.)

But then later on the next page, Walmart states: "For example, the DLSE recommends using "total hours worked …including overtime hours" as the denominator, while Walmart uses hours worked up to 40 hours, ***thus not including weekly overtime hours***.  Because Walmart uses a smaller number as the divisor than what is recommended by the DLSE, this results in a higher "additional regular rate" of pay that

22

inures to the benefit of the associate.  In addition, the DLSE formula suggests half-time to calculate the overtime premium on the bonus, while Walmart uses time-and-a-half, again to the benefit of the associate." (*Id*. at 6:10-17.)

Walmart's own calculations expressly shows on its face that its own calculations are flawed.  As Walmart represented above, it does not include weekly overtime hours in the denominator. (*Id*.)  Yet the chart that Walmart utilized to calculate Evan's Myshare bonus for Q1 2016 expressly shows that it ***does include weekly overtime hours in the denominator***.

For example, for the week ending 1/30/2015 to arrive at the $0.71 amount for the Regular Rate Adjustment (Column 6), it expressly indicated that it is calculated by dividing $16.96 MyShare Incentive Allocation (Column 5) by 23.85 Total Hours Up to 40 (Column 4).  Column 4 is computed by adding 23.81 Regular Hours (Column 2) with 0.04 Overtime Hours (Column 3) to arrive at 23.85 Total Hours Up to 40 (Column 4).  Thus, contrary to its assertions, Walmart ***does*** include overtime hours in its calculations, when it should have only included the Regular Hours (Column 2).

Likewise, for the week ending 2/6/2015, to arrive at the $0.54 amount for the Regular Rate Adjustment (Column 6), it expressly indicated that it is calculated by dividing the $16.96 Myshare Incentive Allocation (Column 5) by 31.39 Total Hours Up to 40 (Column 4).  Column 4 is computed by adding 31.37 Regular Hours (Column 2) with 0.02 Overtime Hours (Column 3) to arrive at 31.39 Total Hours Up to 40 (Column 4).

Contrary to Walmart's assertions, its calculations are not more employee-friendly as it results in the underpayment of wages.  As evidenced by *Alvarado*, Walmart's reliance on the DLSE Enforcement Manual is misplaced in light of *Alvarado v. Dart,* 4 Cal. 5th at 560-561, which expressly overruled the DLSE's policy providing for the method of overtime calculation as a void regulation due to DLSE's failure to adopt it in accord with the Administrative Procedure Act (APA).  *Alvarado* further held that the bonus was properly treated by dividing the amount of the bonus by the ***total number of***

1  ***nonovertime hours actually worked*** during the relevant pay period.  Moreover, although

2  the *Alvarado* court noted that its decision was limited "to flat sum bonuses comparable

3  to the attendance bonus at issue," other types of non-hourly compensation, such as a

4  production or piecework bonus or a commission, may increase in size in rough

5  proportion to the number of hours worked, including overtime hours, and therefore a

6  different analysis may be warranted. (*Id.*, at 561.)  However, that is not the case here as

7  the MyShare incentive plan as Plaintiff worked minimal overtime.

8        Applying the *Dart* methodology for the incentive period January 25, 2014 through

9  April 18, 2014, by only considering Regular Hours (Column 2) in the denominator

10  (rather than also including O.T. Hours up to 40 hours (Column 4) as Walmart does),

11  results in an underpayment of $1.00. (Declaration of James Toney ("Toney Decl."), ¶ 6.)

| | | | | | WalMart | | DART | |
|---|---|---|---|---|---|---|---|---|
| Week Ending | Regular Hours | O.T. Hours | Total Hours Up To 40 | MyShare Incentive Allocation | Regular Rate Adjust. | Adjusted O.T. | Regular Rate Adjust. | O.T. Adjust. |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | | | | (5)/(4) | (3)*(6)*1.5 | (5)/(2) | (3)*(8)*1.5 |
| 01/31/14 | 29.82 | 0.00 | 29.82 | 22.11 | $0.74 | 0.00 | $0.74 | 0 |
| 02/07/14 | 25.94 | 0.00 | 25.94 | 22.11 | $0.85 | 0.00 | $0.85 | 0 |
| 02/14/14 | 29.78 | 0.00 | 29.78 | 22.11 | $0.74 | 0.00 | $0.74 | 0 |
| 02/21/14 | 26.01 | 0.04 | 26.05 | 22.11 | $0.85 | 0.06 | $0.85 | 0.05 |
| 02/28/14 | 34.59 | 0.00 | 34.59 | 22.11 | $0.64 | 0.00 | $0.64 | 0 |
| 03/07/14 | 31.07 | 0.05 | 31.12 | 22.11 | $0.71 | 0.06 | $0.71 | 0.05 |
| 03/14/14 | 33.01 | 6.24 | 39.25 | 22.11 | $0.56 | 5.25 | $0.67 | 6.27 |
| 03/21/14 | 30.35 | 0.00 | 30.35 | 22.11 | $0.73 | 0.00 | $0.73 | 0 |
| 03/28/14 | 31.73 | 0.00 | 31.73 | 22.11 | $0.70 | 0.00 | $0.70 | 0 |
| 04/04/14 | 36.43 | 0.04 | 36.47 | 22.10 | $0.61 | 0.04 | $0.61 | 0.04 |
| 04/11/14 | 39.53 | 0.00 | 39.53 | 22.10 | $0.56 | 0.00 | $0.56 | 0 |
| 04/18/14 | 31.02 | 0.00 | 31.02 | 22.10 | $0.71 | 0.00 | $0.71 | 0 |
| | 379.28 | 6.37 | 385.65 | 265.29 | | 5.41 | | 6.41 |

Applying the *Dart* methodology to the incentive period April 30, 2016 to July 22, 2016

results in an underpayment of $0.02.

| | WalMart | DART |
|---|---|---|

24

| Week Ending | Regular Hours | O.T. Hours | Total Hours Up To 40 | MyShare Incentive Allocation | Regular Rate Adjust. | Adjusted O.T. | Regular Rate Adjust. | O.T. Adjust. |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | | | | (5)/(4) | (3)*(6)*1.5 | (5)/(2) | (3)*(8)*1.5 |
| 05/06/16 | 38.8 | 0.00 | 38.80 | 12.94 | $0.33 | 0 | $0.33 | 0 |
| 05/13/16 | 21.69 | 0.17 | 21.86 | 12.94 | $0.59 | 0.15 | $0.60 | 0.15 |
| 05/20/16 | 37.81 | 0.07 | 37.88 | 12.94 | $0.34 | 0.04 | $0.34 | 0.04 |
| 05/27/16 | 39.69 | 1.22 | 40.91 | 12.94 | $0.32 | 0.59 | $0.33 | 0.6 |
| 06/03/16 | 38.34 | 0.05 | 38.39 | 12.94 | $0.34 | 0.03 | $0.34 | 0.03 |
| 06/10/16 | 27.36 | 0.00 | 27.36 | 12.94 | $0.47 | 0 | $0.47 | 0 |
| 06/17/16 | 38.05 | 0.14 | 38.19 | 12.94 | $0.34 | 0.07 | $0.34 | 0.07 |
| 06/24/16 | 34.97 | 0.00 | 34.97 | 12.94 | $0.37 | 0 | $0.37 | 0 |
| 07/01/16 | 35.10 | 0.70 | 35.80 | 12.94 | $0.36 | 0.38 | $0.37 | 0.39 |
| 07/08/16 | 29.60 | 0.00 | 29.60 | 12.95 | $0.44 | 0 | $0.44 | 0 |
| 07/15/16 | 31.74 | 0.29 | 32.03 | 12.95 | $0.40 | $0.18 | $0.41 | 0.18 |
| 07/22/16 | 32.12 | 0.22 | 32.34 | 12.95 | $0.40 | 0.13 | $0.40 | 0.13 |
| | 405.27 | 2.86 | 408.13 | 155.31 | | 1.57 | | 1.59 |

("Toney Decl."), ¶ 6.)

Putative class members had to do arithmetic calculations in an attempt to discern whether they had been paid correct bonuses and whether they had been paid the correct amount of overtime. Wal-Mart did not provide a breakdown with hourly rates and number of overtime hours worked of how that wage and hour or overtime bonus component was derived. (Pao Decl., ¶ 15.)

## IV. CONCLUSION

For the reasons stated above, this Court should deny Walmart's motion for partial summary judgment as to the Wage Statement and Regular Rate claims and grant summary judgment as to both claims in Plaintiff's favor.

DATED:  February 7, 2020                    SETAREH LAW GROUP

                                            /s/ Shaun Setareh
                                            SHAUN SETAREH
                                            WILLIAM M. PAO
                                            ALEXANDRA MCINTOSH
                                            Attorneys for Plaintiff
                                            JAMES EVANS