# EXHIBIT 2



31 CHATEL DR
LITTLE ROCK, AR 72223
501-366-4164
JT@JTCalcs.com

May 15, 2020

Shaun Setareh Esq.
**SLG | SETAREH GROUP**
315 S. Beverly Dr, Suite 315
Beverly Hills, CA 90212

RE: James Evans v. Wal-Mart Stores, Inc., Case No.2:17-cv-07641-AB-KK (Cent. Dist)

Based on your request, an analysis was performed on the data files provided with a focus on the premium dollars due related to MyShare payments and penalties related to the Wal-Mart policy, which defaults employee's pay to an electronic system versus a paper check option. Categories for calculation are:

- Monies due related to MyShare payments made and premium hours worked in the related period
- Pay stub penalties related to unpaid wages
- Penalties related to the default to an electronic pay system
- PAGA amounts related to both unpaid wages and electronic payment defaults.

I, James Toney, declare as follows:

### 1.     Qualifications

I graduated from California State University with a Bachelor of Science in Accounting in December of 1988. Thereafter, I obtained my Master of Business Administration degree from Chapman University in December of 1994. I was the General Accounting Manager for the Boeing Company and Payroll Manager for Rockwell

1

International Corporation prior to forming and becoming the principal in JTCalcs, which provides expert consulting services for wage and hour class actions. I have been retained and provided expert analyses in more than 650 wage & hour class action lawsuits, as well as a number of individual wage and hour claims. I have reviewed and analyzed data provided in numerous formats and for multiple business types – retail, entertainment, warehouse construction, transportation and medical services. Attached hereto as Exhibit 1 is my current CV.

2. **Testimony in Other Cases**
   a. Yolanda Penny v. San Dimas Community Hospital – November 12, 2013 Superior Court of California Count of Los Angeles – Central District – Case No.: BC427326
   b. Christy McSwiggin V. Omni Limousine – April 14, 2016 The United States District Court for the District of Nevada – Case No.
   c. Joaquin Roces V. Reno Housing Authority – February 2, 2017 United States District Court for the District of Nevada Case No. 3:15-cv-004808-RAJ-WCS
   d. Clara Ortiz V. Oportun Inc. – March 7, 2017 Superior Court of the State of California for the County of Santa Cruz Case NO. CCV 182260
   e. Donald Walden Jr V. The State of Nevada- Department of Corrections – December 7, 2017 United States District Court District of Nevada – No. 3:14-cv-000320-MMD-WGC
   f. Eru Pena Santos v. Double Vision Concepts Inc – February 8, 2018 Superior Court of the State of California for the County of Orange Case No. 30-2017-00723893-CU-OE-CXC
   g. Simon Goro v. Flowers Foods, INC – October 23, 2018 – United States District Court – Southern District of California Case No. 17-cv-02580-JLS-JLB
   h. Roberto Ceja v. Davis Development Company – November 13, 2018

2

    Judicate West – Alternative Dispute Resolution Case No. A238183

 i. Roberto Ceja v. Davis Development Company – November 30, 2018 Judicate West – Alternative Dispute Resolution Case No. A238183

 j. Andrea Spears v. Health Net of California, Inc – February 11, 2019 Superior Court of the State of California – Court of Sacramento Case No. 34-2017-00210560-CU-OE-GDS

 k. Manual Figueroa v. Smith Delivery Corporation – May 28, 2019 Superior Court of the State of California, County of San Diego, Central Division Case No. 37-2016-00041612-CU-BT-CTL

 l. Matthew Bruers v. Flowers Foods INC. – July 30, 2019 – United States District Court Central District of California – Case N0. 18-cv-01442-JLS-ADS

 m. Manual Figueroa v. Smith Delivery Corporation- November 12, 2019 Superior Court of the State of California, County of San Diego, Central Division Case No. 37-2016-00041612-CU-BT-CTL

**3.**   **Expert Compensation**

The hourly rates charged by category are:

 a. Data Analysis - $200.00 per hour

 b. Deposition and Trial Support - $250.00 per hour

 c. Travel - $200.00 per hour

**4.**   **Documents Reviewed**

The following documents were provided to Plaintiff's attorney and were used in preparing the opinions and conclusions contained within this declaration.

 a. MyShare Quarterly Incentive Plan documents for FYE 2014, 2015, 2016, 2017

 b. Individual Excel payroll files for 123,890 employees

 c. DOC002024 through DOC002033 containing hours worked and MyShare weekly amounts

    d. DOC002035 containing pay check information including payment method

5. **Facts and Data Considered**

I was retained by Plaintiff's Counsel to serve as a data analysis and damages expert in the above referenced matter. It is my understanding that employees are due monies for both unpaid wages and penalties. The calculation categories are below.

- Unpaid premium dollars related to overtime hours worked during MyShare incentive payment periods.
- Penalties related to the policy of defaulting employees to an electronic payment process.

6. **Unpaid Premium Dollars – MyShare Payments – Overtime Hours**

Counsel provided "MyShare Quarterly Incentive Plan" documents which provided the incentive quarterly dates for the plan years 2014 through 2017. While reviewing the plan documents, it was noted that the incentive period ranges between 12 and 14 weeks. These quarterly weeks are not consistent through the years. Payments of MyShare were observed in the payroll file (DOC002035) through early December of 2019. Damages will be calculated through the periods available and extrapolated through May 15, 2020. In order to make the calculation of monies due to the employee, both the hours worked and incentive award accrued was pulled from files DOC002024 through DOC002033 and payroll data from DOC002035. The fields utilized were the following:

- WIN_NBR contains the employee number
- WKLY_END_DATE – ending date of the weekly period
- DOE_CODE multiple codes
    - REG – Regular Hours
    - OTM – Overtime Hours
    - DTM – Double Time Hours
    - TOT_DOLLAR_AMT – Amount Paid
    - W2 – MyShare Incentive Payments
    - P5 – Overtime Adjustment related to MyShare payments

4

- o PAYROLL_RUN_DATE

Based on the date ranges provided in the MyShare Quarterly Incentive Plan document, a table was created which provided the week ending dates for incentive periods available. Once this table was available it was linked to the information in files DOC002024 through DOC002033. This link allowed for hours data to be totaled by incentive period. In addition to hours, these files contained the weekly MyShare incentive amounts. These MyShare amounts were totaled by quarter which enabled a link to the payroll data. This link was required as the payroll data contained a payroll run date versus a week end date or incentive period data for payments made. The MyShare payments are made approximately 6 weeks after the Incentive Quarter period. Payments are made using the code W2. In addition to the MyShare payments, there is a payment under P5, which it titled OVERTIME/INCT. Payments under this code are payments toward the amount due related to the increased regular rate driven by the incentive payments.

In order to calculate the premium dollars due related to incentive payments, the following steps were taken:

- Summarize straight-time, overtime and double time hours by employee and the incentive period.
- Summarize the MyShare accrual in the hours worked files
- Linked the hours worked, MyShare accrual, MyShare payment and OVERTIME/INCENT payment. These items are to be summarized on a single line.
- Calculate the premium hours due using the hours worked and incentive payments made.
- Calculate the difference between the calculated amount due and the adjustment paid to determine if additional monies are outstanding.

The formula utilized for the premium dollars due it the following.

- The incentive amount accrued/paid divided by the regular or straight-time hours.

5

- The product of the above equation is then multiplied by 1.5
- The calculated rate is then multiplied by the overtime hours worked
- For double time hours, the formula is the calculated rate multiplied by 2 then multiplied by double time hours.
- Once the overtime and double time monies due are known, they are compared to the amount paid under the OVERTIME/INCT code. This difference is the amount owed to the employee.

Below is an example of this calculation for employee number 217914530 for the incentive end date of 4/17/15

- The MyShare amount accrued/paid was $333.94
- Straight Time hours worked equaled 445.87
- Overtime hours worked equaled 6.43
- Calculated rate equals $333.94 divided by 445.87 or $0.75
- Adjustment rate equals $0.75 multiplied by 1.5 or $1.12
- Monies due to the employee are $1.12 multiplied by overtime hours of 6.43 or $7.20
- OVERTIME/INCENT amount is $6.97 (pulled from the payroll file)
- Outstanding amount is $7.20 minus $6.97 or $0.23

This calculation was done for all MyShare payments made that were matched between the hours files and payroll files. Based the periods available for comparison, the average amount owed per MyShare payment made was $0.26. The average of $0.26 is based on the sample of records where MyShare payments matched in the hours and payroll files. For these records a calculation was done at the employee and week level. The matching record count was approximately 170,000 quarterly payments. There were approximately 1,260,000 MyShare payments made through the first month of 2017. Based on this experience, the estimate of payments through May of 2020 is 1,795,000. Using the average rate of $0.26, the monies due to employees is 1,795,000 multiplied by $0.26 or $466,700.

When simple interest at the rate of 10% is applied, the amount is $466,700.00 plus interest of $156,613.80 for a total of $623,313.80.

Approximately 74% of the MyShare payments resulted in an under payment. This equates to violation count of 1,795,000 multiplied by 74% or 1,328,300.

The violation period count of 1,328,300 needs to be adjusted prior to calculating pay stub penalties, as this period begins September 13, 2016. The number of weeks between September 13, 2013 and May 15, 2020 is 348. The calculated count per week is 1,328,300 divided by 348 or 3,818. When you apply this to the period of September 13, 2016 through May 15, 2020, which is 191 weeks, you get a period count of 3,818 multiplied by 191 or 729,238. Based on the head counts in the payroll file, it is assumed that the related employee count is 191,462. The pay stub penalty would be 191,462 multiplied by $50.00 or $9,573,100 for the initial period. For subsequent periods, the calculation is 729,238 periods minus the head count of 191,462 or 537,776. The 538,866 is then multiplied by $100 for an amount of $53,777,600. The total pay stub penalty is then $9,573,100 plus $53,777,600 or $63,350,700.

The related PAGA would calculated the same way with the resulting amount of $63,350,700.

### 7. Penalties – Policy to Default Employees Pay to Electronic Format

My understanding is that employees are defaulted to an electronic payroll processing distribution. Since employees were not offered a paper check option for payroll processing, a penalty is calculated for all checks distributed electronically.

I was provided the file "DOC002035" which contained employee pay information. The fields utilized from this file are:

- "A WIN_NBR" – employee number
- "CHECK_NBR"
- "CHECK_DATE"

- "CHECK_TYPE – codes are "C" for paper check and "D" for electronic payments

Within the file there is a field titled "Check_Code". This code is populated with either a "C" for a paper check and "D" for electronic payments. Based on input from counsel, these codes are the only ones available in the system. For the purpose of penalty calculations, checks coded as "D" will be considered to have a penalty due. The file was filed on September 13, 2017. The pay stub penalty has a starting point one year prior to the filing or September 13, 2016. The data contained within "DOC002035" is for the period September 13, 2016 through November 27, 2019. The file contained data for approximately 191,400 employees. Employees that received a paper during the period were approximately 121,000 or 63%. Of the employees who received checks, 70% of them received 3 or fewer checks during the entire period available. Payments coded as "D" represented 90% of the disbursements made and numbered approximately 574,000. Data provided cut off at November 27, 2019 and was then extrapolated through May 15, 2020 for those employees who were active on November 27, 2019. The total pay period count, including the extrapolation, is approximately 6,661,000. This count equates to an average per employee of 35 pay periods. The initial penalty is $50 with subsequent periods penalized at $100.

The penalty calculation is:

- Initial pay period count of 191,462 multiplied by $50.00 or $9,573,100
- Subsequent pay period count equals 6,661,300 – 191,462 or 6,469,838
- Subsequent pay period penalty is 6,469,838 multiplied by $100 or $646,938,800.
- There is a maximum per employee of $4,000 taking this into account, the net penalty is $406,974,450.

In addition to the pay stub penalties, counsel requested a related calculation for PAGA. PAGA calculations are based on labor code 226. The calculation is similar to the above

8

with the exception that there is no maximum per employee. The PAGA amount is $646,938,800.

To a reasonable degree of professional certainty, the contents of this declaration represent my opinion. I alone conducted the analysis contained within this document. I reserve the right to alter or amend my opinion should additional information become available or clarified.

I declare under penalty of perjury, under the laws of the United States of America and the State of California, that the foregoing is true and correct.

Dated this 15th day of May 2020.

James R. Toney