# EXHIBIT 5

Robert J. Herrington (SBN CA 234417)
GREENBERG TRAURIG LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Tel:  (310) 586-7816
Fax: (310) 586-0219
Email:  herringtonr@gtlaw.com

Naomi Beer (Admitted *Pro Hac Vice*)
GREENBERG TRAURIG LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Telephone: 303-572-6500
Facsimile: 303-572-6540
beern@gtlaw.com

Attorneys for Defendant WALMART INC.
f/k/a WAL-MART STORES, INC.

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES S. EVANS, on behalf of himself, all others similarly situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>WAL-MART STORES, INC., a Delaware corporation; and DOES 1 through 50, inclusive,<br><br>          Defendants. | Case No. 2:17-cv-07641-AB-KKx<br><br>**DEFENDANT'S SECOND REBUTTAL EXPERT WITNESS DISCLOSURE** |

*ACTIVE48225400*

Defendant Walmart Inc., f/k/a Wal-Mart Stores, Inc. ("Walmart") submits this disclosure of its second rebuttal expert pursuant to Federal Rules of Civil Procedure 26(a)(2) and pursuant to this Court's Order (Dkt. 167).

## A. **RETAINED EXPERT**

1.     Dr. Elizabeth Hart Newlon
      Director
      NERA
      777 South Figueroa Street
      Suite 1950
      Los Angeles, CA 90017
      Dr. Newlon's Expert Report is enclosed.

* * *

Walmart reserves the right to amend, supplement or modify this designation as may be appropriate in light of Plaintiff's designations of fact or expert witnesses, further proceedings, papers, pleadings or orders in this action, further discovery in this action, or such other reasons as may make amendment, supplementation or modification appropriate. Walmart reserves the right to designate as witnesses in this action any party or any witness designated by any other party and to call any witness to testify only by their deposition that may have been or may be taken in this action. Walmart further reserves the right not to call any witness designated herein or hereafter as a witness at trial or any other proceeding or to strike any witness from this or future designations.

DATED:  July 6, 2020             GREENBERG TRAURIG, LLP

By /s/ *Robert J. Herrington*
    Robert J. Herrington
    Attorneys for Defendant WALMART INC. f/k/a
    WAL-MART STORES, INC.

DEFENDANT'S SECOND REBUTTAL EXPERT DISCLOSURE

*ACTIVE48225400*

## I.    INTRODUCTION

### A.    Assignment

1.    My name is Elizabeth Newlon.  I am a Director at NERA Economic
Consulting.  I previously prepared a declaration in this matter, submitted on
January 15, 2020 ("Newlon January Declaration" attached as **Appendix A**).[1]

2.    I was asked by Counsel for the Defendant, Walmart Stores Inc. ("Walmart"),
to review the declarations of Mr. James Toney, his deposition testimony, and
the related allegations made by Plaintiffs and opine on Mr. Toney's damages
analyses.[2]  I reserve the right to supplement my opinion in response to any
supplemental filings produced by Mr. Toney and any additional expert
reports produced by Plaintiffs.[3]

### B.    Materials Considered

3.    I, and economists working under my direction, have reviewed the
information sources and materials presented in **Exhibit 2**.  The opinions
expressed in this report are based on my review of this information as well
as my training and experience as an economist.

### C.    Summary of Opinions

4.    Based on my analysis to date, I have reached the following opinions:

- Mr. Toney did not provide a classwide method for calculating
individual class member's alleged overtime damages.  Instead, Mr.
Toney used an average damage amount per MyShare payment to
estimate aggregate damages for the class.  An average is not a
classwide methodology that can calculate individual damages.  By
proposing to give all MyShare Bonus overtime payments the same
amount of damages, Mr. Toney is giving class members damages
when they were overpaid by Walmart under Plaintiffs' claim.  Mr.

---

[1] An updated version of my curriculum vitae is appended to this report as **Exhibit 1**, which includes a list of my publications.
[Declaration of Elizabeth H. Newlon, Ph.D., January 15, 2020 ("Newlon January Declaration")].

[2] Declaration of James Toney, October 1, 2019 ("Toney October"); Declaration of James Toney, December 16, 2019 ("Toney
December"); Declaration of James Toney, May 15, 2020 ("Toney May"); Deposition of James Toney, June 25, 2020
("Toney June Deposition").

[3] I take no position on the legal issues in this matter.

Toney also is proposing to award damages to class members who
were never injured, even under Plaintiff's theory of liability.

- Mr. Toney also has not provided a methodology to calculate penalties
  for individual class members.  Instead of identifying the pay periods
  on which a class member was underpaid overtime based on Plaintiff's
  theory and assigning the correct penalty amount, Mr. Toney estimates
  the aggregate wage statement penalties.  Mr. Toney's approach is
  incorrect because it understates the penalty amount when a class
  member was underpaid overtime based on Plaintiff's theory and
  assigns penalties even when a class member was not underpaid and
  should not receive any penalty based on Plaintiff's theory.  In other
  words, Mr. Toney again proposes to award penalties to class members
  who, even under Plaintiff's theory, are not entitled to penalties.

- Mr. Toney's calculation of penalties in connection with the Wage
  Statement Class is faulty because he provides no analysis of which, if
  any, class members were injured by the receipt of an electronic wage
  statement rather than a paper wage statement.  He simply assumes that
  every class member was injured if they received an electronic wage
  statement.  There is, however, evidence (including Mr. Toney's own
  analyses) that class members had different preferences for the form of
  their wage statement and a choice over whether they received a paper
  or an electronic statement.  If class members have different
  preferences for the form of their wage statements, Mr. Toney's
  assumption that class members were injured with every electronic
  wage statement is incorrect.  He provides no methodology to award
  penalties to only those who had an actual injury and exclude those
  who did not.

- Mr. Toney made numerous mistakes in his damages and penalty
  calculations.  Mr. Toney analyzes only a small subset of the available
  data to calculate his proposed damages and penalty amounts because
  of his failure to match the data sources on which his calculations rely
  and his inability to identify the dates in each quarter after fiscal year
  2017.  Mr. Toney's matching methodology relies on only MyShare
  Bonus amounts for each class member and causes him to make
  erroneous matches for the data he used to calculate his average.  Mr.
  Toney then applies the erroneous average to all MyShare Bonus
  payments in the class period, including those without any associated

2

overtime. He also included associates who opted out of both classes, as well as MyShare Bonuses for work in stores or facilities outside of the class.

- In his most recent declaration, Mr. Toney does not simply replicate for the two classes the analyses of Mr. Evans's alleged damages and penalties that he performed in his prior declarations. In total, Mr. Toney has presented four different methods for calculating the overtime payments for the MyShare Bonus. Mr. Toney now provides new methods for calculating the alleged underpayment in overtime, the associated wage statement penalties, and the electronic wage statement penalties. Moreover, Mr. Toney presents PAGA penalties, which were absent from all of his prior declarations. He provides no justification for his change in approach.

- In his most recent opinion, Mr. Toney describes using the flat sum method to calculate the regular rate for the MyShare Bonus overtime payments. However, Walmart maintains that the MyShare Bonus is not a flat sum bonus, and as such, the method that Mr. Toney uses does not apply. Using the production bonus method, both the named Plaintiff Evans and the individual associate that Mr. Toney singled out in his recent declaration were overpaid by Walmart instead of underpaid as Mr. Toney claims.

5.    These opinions and the following analysis are based on my review of the documents and information made available to me to date. As noted, I reserve the right to update my opinions should additional information be provided to me.

**D.    Summary of Plaintiffs' Claims**

6.    Plaintiffs allege that Walmart failed to pay California associates "overtime wages for all overtime hours worked… as a result of not correctly calculating their regular rate of pay to include all applicable renumeration, including, but not limited to, commissions and non-discretionary bonuses."[4] In particular, Plaintiffs allege Walmart did not correctly calculate the regular rate of pay for the MyShare Bonus payments.[5]

---

[4] First Amended Complaint, filed November 20, 2017 ("Complaint"), ¶ 30.

[5] Memorandum of Points and Authorities, filed July 22, 2019 ("Points and Authorities"), pp. 10-13.

3

7.    Plaintiffs also claim that Walmart failed to provide accurate written wage statements.[6] Plaintiffs allege that associates did not "retain the right to elect to receive a written paper stub or record" and did "not receive paper wage statements at all."[7] In addition, Plaintiffs allege that wage statements did not accurately reflect many of the necessary components because the "[r]egular rate of pay was not properly calculated."[8]

8.    In his May declaration, Mr. Toney states that he is trying to analyze damages and penalties for following classes:[9]

- The Regular Rate Class – "All persons employed as hourly-paid employees by Defendant in any store in California at any time on or after September 13, 2013 through the date of class certification who were paid overtime and non-discretionary bonus in any pay period."[10]

- The Wage Statement Class – "All persons employed as hourly-paid employees by Defendant in any store in California at any time during the period beginning one year before the filing of this action and ending when final judgment is entered."[11]

## II.    MR. TONEY FAILED TO PROVIDE A METHODOLOGY TO CALCULATE OVERTIME DAMAGES AND ASSOCIATED PENALTIES ON A CLASSWIDE BASIS

## A.    Mr. Toney Did Not Provide a Classwide Method for Calculating Each Regular Rate Class Member's Alleged Overtime Damages

9.    In his May declaration, Mr. Toney did not provide a classwide method for calculating individual class members' overtime damages. Instead, Mr. Toney used an average damage amount per MyShare payment to estimate aggregate damages for the class. An average is not a classwide methodology that can calculate individual damages. When Mr. Toney applied an average, he is applying a fixed amount of damages to all class members' MyShare Bonus quarters. This approach ignores all individualized differences and

---

[6] Complaint, ¶¶ 97-102.

[7] Points and Authorities, p. 16.

[8] Complaint, ¶¶ 34-38.

[9] In his November 2019 decision, Judge Andre Birotte Jr. certified both classes. [Order Granting Motion to Stay Proceedings with Respect to Count VI and Granting In Part and Denying in Part Plaintiffs' Motion for Class Certification, filed November 25, 2019 ("Class Cert Order"), pp. 2, 15, 21, and 22.]

[10] Class Cert Order, p. 2.

[11] Class Cert Order, pp. 2-3.

treats every class member and circumstance during the class period the same.  As a result, Mr. Toney's proposed methodology both overstates and understates each class member's alleged damages and proposes to award damages to class members who were not injured under Plaintiffs' theory.

10.  Plaintiffs claim that the Regular Rate Class was injured when Walmart did not pay the additional overtime for the MyShare Bonus correctly.  Mr. Toney calculated the alleged overtime damages for the Regular Rate Class by multiplying an average underpayment of overtime equal to $0.26 per MyShare Bonus by his count of the MyShare Bonus payments during the class period.[12]  Mr. Toney's average was calculated from a subset of individual calculations Mr. Toney performed comparing the additional overtime payment Walmart provided to each associate for their MyShare Bonuses to the additional overtime payment from the MyShare Bonus calculated using Plaintiffs' overtime formula.[13]  Mr. Toney testified that Plaintiffs asked him to use the flat sum bonus overtime formula.[14]  This is despite the Plaintiffs describing the MyShare Bonus as a production bonus.[15]  In Mr. Toney's calculation, a class member is underpaid when Plaintiffs' overtime formula generated a larger overtime amount than the amount Walmart paid the class member.  Mr. Toney also identified many class members who were overpaid under Walmart's formula when compared to Plaintiffs' overtime formula.

11.  Out of the 173,041 MyShare Bonus overtime payments Mr. Toney analyzed, he found 127,083 underpayments, 42,361 overpayments, and 3,597 exact payments.[16]  In other words, Mr. Toney's calculations show that Walmart's formula resulted in a larger overtime payment than Plaintiffs' formula for almost 24 percent of the overtime payments.  Yet Mr. Toney proposes to award an average damage amount even in these 24 percent of instances where Walmart's formula resulted in a larger overtime payment than Plaintiffs' formula.

---

[12] I describe Mr. Toney's calculation in more detail in Section IV.

[13] Plaintiffs' counsel asked Mr. Toney to apply the formula used to calculate overtime for a flat sum bonus. [Toney June Deposition, 48:15-50:5.]

[14] Toney June Deposition, 48:15-50:5.

[15] Plaintiffs' Reply in Support of Motion for Class Certification, October 1, 2019, p. 16.

[16] Mr. Toney erroneously testified that the count of overpayments in his analysis was 36,000-37,000. [Toney June Deposition, 36:22-37:11; Toney work papers.]

12.  Similarly, the 173,041 subset of MyShare Bonus periods analyzed by Mr. Toney are associated with a subset of 71,470 class members, 8,995 (13 percent) of whom were not underpaid at all based on Plaintiffs' theory and Mr. Toney's analysis.[17] Yet, by using an average to calculate damages, Mr. Toney proposes to award damages to these uninjured class members. He also does not address how many associates in the class as a whole were not injured under Plaintiff's theory, although if 13 percent of the class is likewise uninjured, there would be over 15,000 uninjured class members.[18] Mr. Toney proposes to apply his average to all MyShare Bonus payments for each class member, irrespective of whether a class member was injured.

13.  The use of an average to determine individual damages is also incorrect because it overcompensates many individuals and undercompensates individuals who were underpaid by more than the average based on Plaintiffs' proposed formula. For example, **Exhibit 3** presents the distribution of individual over- and under-payments of overtime calculated by Mr. Toney. The average used by Mr. Toney divides the distribution at the red line. When Mr. Toney applies one damage amount, $0.26, all class members to the left of the red line are undercompensated for their underpayments. On the other hand, all class members to the right of the red line are overcompensated because their underpayment is either less than $0.26 or they were overpaid by Walmart as compared to Plaintiffs' formula.[19]

**B.    Mr. Toney Does Not Provide a Classwide Method for Identifying the Wage Statement Penalties Allegedly Owed to the Regular Rate Class**

14.  Mr. Toney fails to identify the correct penalties allegedly owed to individual class members based on the overtime claims. Instead of identifying the pay periods on which a class member was underpaid overtime and assigning the correct penalty amount, Mr. Toney estimated aggregate penalties to the Regular Rate Class by assigning a penalty to all pay periods on which the class members received a MyShare Bonus payment.[20] Mr. Toney's approach is incorrect because it underestimates the penalty amount in some

---

[17] Toney work papers.

[18] $15,337 = 0.1258 * 121,863$, where $0.1258 = 8,995 / 71,470$.

[19] In Exhibit 3, the overpayments are colored green and the underpayments are colored yellow.

[20] Toney May, pp. 6-7; Toney work papers.

instances and assigns penalties even when a class member was not underpaid under Plaintiffs' theory.

15.    When estimating wage statement penalties, Mr. Toney assumes a $50 initial payment for all class members working during the statute of limitations period.[21] This calculation is based on the assumption that every class member was underpaid overtime under Plaintiffs' overtime claim during the wage statement statute of limitations period, which he provides no support for. As was discussed in the prior section, Mr. Toney's calculations contradict this assumption, showing that some class members were paid more overtime by Walmart than under Plaintiffs' proposed formula and thus would not be entitled to any penalty even under Plaintiffs' theory of the case. Mr. Toney does not address this issue in his calculation of wage statement penalties.

16.    To estimate the rest of the aggregate penalties, Mr. Toney assumes that penalties are owed on 74 percent of the MyShare Bonus payments received during the statute of limitations. After subtracting the count of class members from the 74 percent of MyShare Bonus payments, he multiplies the difference by $100 to calculate the remaining penalties.[22]

17.    Mr. Toney's estimation procedure for wage statement penalties is inaccurate because it underestimates the penalty amount for some instances when there is an underpayment of overtime and overestimates the penalty amount when no penalty is owed. For instance, **Exhibit 4** presents Mr. Toney's penalty amounts for the set of MyShare Bonus payments he calculated overtime payments based on Plaintiffs' overtime claim. His approach assigns either $50 or $67.73 in penalties for underpayments in overtime.[23] Therefore, if a $100 penalty is owed to a class member, Mr. Toney is underestimating the penalty payment. The right-hand side of Exhibit 4 shows that for overpayments of overtime, Mr. Toney is applying either a $50 or $67.73 penalty when the true penalty should be $0.

18.    Finally, Mr. Toney also did not provide a method for identifying when a wage statement penalty on the overtime claim occurs on the same pay period

---

[21] The statute of limitations for the wage statement penalties goes back to September 13, 2016. [Toney May, p. 7.]

[22] Mr. Toney's approach assumes a class member receives $50 + $100 * (X*74% - 1) in penalties, where "X" is the total number of MyShare Bonus payments the class member received during the statute of limitations period.

[23] However, it is unclear which value he does give to any of the payments he analyzed since he is applying an aggregate calculation to all MyShare Bonus payments.

as a wage statement penalty on Plaintiffs' electronic wage statement claim.[24] His use of an aggregate penalty calculation prevents him from identifying when he is double counting wage statement penalties for pay periods with both an alleged underpayment in overtime and an electronic payment. He admitted in his deposition that this was an issue that he did not consider in his May declaration.[25]

### III.   MR. TONEY DOES NOT ADDRESS THE KEY QUESTIONS NECESSARY TO ASSIGN PENALTIES FOR THE WAGE STATEMENT CLASS

19.   To identify penalties for the Wage Statement Class, Mr. Toney uses data containing pay check information ("Wage Statement Data"), including whether the payment was made by paper check or electronically.[26] Yet Mr. Toney made no attempt to answer the question of which class members were somehow injured based on receiving an electronic statement rather than a paper statement. Instead, he assumes that every time an associate received an electronic statement, they were injured, and a wage statement penalty is owed.

20.   Given the general diversity of human preferences for goods and services, it is likely that at least some of the members of the Wage Statement Class had different preferences for electronic versus paper wage statements.[27] Some may have preferred electronic. Some may have preferred paper. Some may have had different preferences at different times. And others may have had no preference at all. To treat every electronic statement as causing injury, Mr. Toney must have evidence that all or nearly all of the class members were injured when they received an electronic statement. Yet, Mr. Toney provides no basis for his assumption. Moreover, he admitted in his deposition that he did not look for evidence in support of his assumption.[28]

21.   Mr. Toney also ignores that there is evidence in the Wage Statement Data that class members had a variety of preferences for the form of their wage statements. There are 188,846 associates in the Wage Statement data.[29] Of

---

[24] Toney June Deposition, 73:17-75:1.

[25] Toney June Deposition, 71:17-72:4.

[26] Toney May, pp. 7-8. [See, DOC002035.]

[27] Microeconomic theory focuses on choices made by consumers. Decision making is driven by each consumer's relative preferences for the goods in their choice set. When an individual makes the choice between two goods or services, they are revealing which of the two they prefer.

[28] Toney June Deposition, 90:12-91:5.

[29] My analysis excludes non-payment records such as checks that were voided, $0, or for garnishments.

these associates, 27,367, or 14.5 percent, always received paper checks, thus providing evidence that some class members preferred paper wage statements and were able to choose to receive that form of wage statement exclusively. If 14.5 percent of the class had a choice of their type of wage statement, it is not unreasonable to ask whether some of the class members who switched from a paper statement to an electronic statement chose to do so because they preferred to receive an electronic statement. Out of the 50,995 class members, or 27 percent of all class members, who received an electronic statement after receiving paper statements, it remains unclear how many switched because they preferred receiving an electronic statement. Mr. Toney did not attempt to answer this question in his declaration.

22.     The evidence that class members had different preferences for the form of their wage statement and a choice over whether they received a paper or an electronic statement casts significant doubt on the validity of Mr. Toney's assumption that all class members were injured when they received an electronic statement. Even for class members who only received electronic statements, there is no evidence that every person always preferred to receive paper statements. If class members have different preferences for the form of their wage statements or no preference at all, Mr. Toney's assumption that class members were injured with every electronic wage statement is incorrect, and he has provided no methodology to identify injured class members versus uninjured class members. This failure leads to Mr. Toney proposing to award penalties to a substantial number of class members who may have had no injury at all.

## IV.   MR. TONEY MADE ADDITIONAL MISTAKES IN HIS ANALYSIS THAT AFFECTED HIS DAMAGES AND PENALTIES

23.     Mr. Toney erroneously applied an average overtime underpayment to classwide data because he was unable to correctly identify matches, even though the information needed to conduct this analysis was available to him and Plaintiffs. In addition to this significant data error, he made many additional errors in his analysis.

24.     Mr. Toney relied on three data sources for his analysis of overtime damages – (1) the MyShare Quarterly Incentive Plan documents for fiscal years 2014 through 2017, (2) payroll files for 123,890 associates ("Payroll Data"), and (3) data containing hours worked and MyShare Bonus weekly amounts used by Walmart to calculate the overtime on the bonus payment ("Weekly Hours Data"). Mr. Toney made several errors in his use of these data.

25.    Mr. Toney limited the number of MyShare Bonus payments he analyzed by excluding MyShare Bonuses earned after January 20, 2017.[30] He claims that without the Walmart MyShare plan documents, he could not identify the MyShare Bonus periods after fiscal year 2017.[31] However, by simply looking at the pattern of payments in the data, he could have identified the beginning and end dates of any given plan quarter.

26.    Even within the dates that Mr. Toney chose to analyze, Mr. Toney directly calculated alleged damages for a relatively small subset of the MyShare Bonus payments. Mr. Toney said that he did not analyze all available MyShare Bonus payments because he was able to match the Weekly Hours Data and the Payroll Data for only 177,336 MyShare Bonus payments, which represents just 15 percent of all the MyShare Bonus payments in the Walmart data in the quarters for which full data are available.[32] Moreover, Mr. Toney calculated his average underpayment of $0.26 per MyShare Bonus payment using only a subset of the MyShare payments he matched.[33] It is unclear from his work papers why he chose to use only these records to calculate his average.

27.    Because he did not calculate damages for most of the MyShare Bonus payments, Mr. Toney estimated total aggregated damages for the Regular Rate Class. He does so by multiplying *all* of the MyShare Bonus payments in the Payroll Data, 1,260,000 observations, including all of the quarters he did calculate damages for, and 535,000 quarters he estimated for the period after the data end (approximately 1,795,000 MyShare Bonus payments), by the average underpayment of $0.26 per MyShare Bonus.[34] In addition, Mr.

---

[30] By truncating his data, Mr. Toney decreased the number of MyShare Bonus payments in his overtime analysis from 1,085,574 to 573,900. This count of MyShare Bonus payments covers observations within the dates of the Weekly Hours Data. The MyShare Bonus overtime payments for the Q3 2014 (July 27, 2013-October 18, 2013) cannot be analyzed because the Weekly Hours Data start on September 13, 2013 making the hours for the quarter incomplete. This excludes the 30,331 MyShare Bonus payments with an associated overtime payment for Q3 2014. [Toney work papers; Weekly Hours Data.]

[31] Toney May, p. 6. Walmart produced MyShare plan documentation for fiscal years 2014 through 2017. [DOC000001-15; DOC000980-992; DOC000993-1005; DOC001006-1020] It is my understanding that Walmart also produces MyShare plan documents for subsequent fiscal years.

[32] There are approximately 1,182,709 bonus payments in the Walmart data in the plan quarters for which full data are available. [Toney May, p. 6; Toney work papers.]

[33] Mr. Toney only used 173,041 of the 177,336 MyShare Bonus payments he identified as matching to calculate his average overtime underpayment. [Toney May, p. 6; Toney work papers.]

[34] Toney May, p. 6; Toney work papers. Mr. Toney rounded the number of MyShare Bonus payments in the Payroll Data up for his calculation. The actual number of MyShare Bonus payments in the Payroll Data is 1,256,594. Moreover, based on the MyShare Bonus counts Mr. Toney included in his report, it appears that he included the MyShare Bonus payments received on September 8, 2013 before the class period start date of September 13, 2013. If I include the MyShare Bonus payments on September 8, 2013, the total count of MyShare Bonus payments is approximately 1,260,000, which is the count of

Toney makes the error of applying his average underpayment to all MyShare Bonus payments. He should have excluded the bonus payments that did not have an accompanying overtime payment, as he did when calculating his average underpayment.[35] By including all payments, Mr. Toney assumed overtime damages on MyShare Bonus payments in quarters without overtime.

28.    In addition to being unable to identify all of the MyShare Bonus periods, Mr. Toney's method for matching the Payroll and Weekly Hours Data was not the correct approach. Mr. Toney made several errors in his matching of the MyShare Bonus payments between the Payroll Data and the Weekly Hours Data to analyze the allegedly unpaid overtime damages. Mr. Toney matched incentive quarters between the two datasets by totaling the MyShare Bonus amounts allocated to each week in an incentive quarter in the Weekly Hours Data and trying to match it with every MyShare Bonus payment of the same amount for the same WIN in the Payroll Data regardless of the dates of the payment amounts in each dataset. Mr. Toney acknowledged that "MyShare payments are made approximately 6 weeks after the Incentive Quarter period," yet he did not rely on the week ending date in the Weekly Hours Data and the payroll run date in the Payroll Data to conduct his matches.[36] An exact match on the MyShare Bonus amounts is not necessary because the MyShare Bonus amounts in the Weekly Hours Data simply show how Walmart allocates the MyShare Bonus amounts across the weeks in an incentive quarter for the purpose of calculating overtime payments, but the Payroll Data show the actual MyShare Bonus amount paid. The purpose of the Weekly Hours Data is to provide the number of overtime hours earned in each incentive quarter. Moreover, Mr. Toney should have investigated incentive quarters where the MyShare Bonus amounts between the two data sources were not exact matches to see if there was an error in his matching process. As I explain below, Mr. Toney's matching on MyShare Bonus amounts and not dates resulted in many erroneous matches.

29.    Mr. Toney's matching methodology allowed multiple matches to occur. **Exhibit 5** presents an example of an associate who received three MyShare Bonus payments of $165 in the Payroll Data and had two incentive quarters in the Weekly Hours Databuild that Mr. Toney created where the MyShare

---

payments Mr. Toney reports in his declaration. [See, Toney May, p. 6.] Excluding the payments on September 8, 2013, the count of MyShare Bonus payments is approximately 1,220,000, less than the count analyzed by Mr. Toney.

[35] Toney work papers.

[36] Toney May, p. 5.

11

Bonus allocations totaled $165 in each incentive quarter.[37] Using Mr. Toney's data, there should be only two matches for this example. However, Mr. Toney matched both incentive quarters in the Weekly Hours Databuild that he created to all three MyShare Bonus payments in the Payroll Data, erroneously producing a total of six matches.

30.   Furthermore, because Mr. Toney did not rely on dates to perform his matching, Mr. Toney matched data from different time periods from the Weekly Hours Data to the Payroll Data. For his overtime analysis, Mr. Toney analyzed the Weekly Hours Data through fiscal year 2017, which ended on January 20, 2017.[38] However, he did not limit the dates of the Payroll Data, which go through December 6, 2019.[39] Thus, he (mis)matched incentive quarters prior to January 20, 2017 in the Weekly Hours Data to MyShare Bonus payments earned from incentive quarters after January 20, 2017 in the Payroll Data.

31.   Mr. Toney made an additional set of errors by not including the correct associates in his analysis. First, he did not include the named plaintiff, Mr. Evans, in his analysis. Mr. Toney also erroneously included associates that are not in the class when he did not omit opt-outs from his analyses.[40] Furthermore, Mr. Toney included class members' pay periods when they were not working at California Walmart stores. In addition to associates' work at Walmart stores outside of California, Mr. Toney erroneously included work at Sam's Clubs, fulfillment centers, and distribution centers.[41]

32.   Mr. Toney's mistakes affected his analysis of overtime damages and wage statement penalties. **Exhibit 6** presents a cumulative summary of the effects of some of his mistakes. By including MyShare Bonus payments earned in incentive periods after fiscal year 2017 and before the start of the regular rate class period, Mr. Toney overstated the count of MyShare Bonuses in the class period by 33,603 incentive quarters. Next, correcting for Mr. Toney's error of matching a quarter in the Weekly Hours Data to multiple MyShare Incentive payments in the Payroll Data, the average underpayment decreases

---

[37] The incentive quarter ending on October 30, 2015 also had a MyShare Bonus amount of $165, but Toney incorrectly calculated the MyShare Bonus amount for this quarter.

[38] Toney May, p. 4; Toney Work Papers; DOC000003.

[39] WIN_EarningsHist.xlsx where WIN is the WIN for each of 123,890 associates.

[40] Toney Work Papers; Evans_Opt Outs_WINs.xlsx. Of the associates he analyzed in his overtime analysis, 48 of them are opt-outs, which accounts for 132 person-quarters.

[41] The data included 3,674 locations that should be excluded from the class. [Evans_Wage Statement Class_California Stores.xlsx.]

from $0.26 to $0.25 per incentive quarter. Correcting for Mr. Toney's error of awarding damages to incentive periods without an OVERTIME/INCT payment would decrease damages by an additional $26,385. Finally, correcting for Mr. Toney's inclusion of Walmart stores outside of California and non-Walmart stores decreases damages by an additional $40,737.

33.    Mr. Toney's extrapolation methodology to calculate overtime damages through May 2020 is also flawed because he incorrectly estimated the number of MyShare Bonus payments through May 2020.[42] Mr. Toney estimated 1,795,000 MyShare payments from September 2013 through May 2020.[43] There are 1,222,991 MyShare Bonuses between September 13, 2013 and December 6, 2019, when the data end. Mr. Toney estimated that there were 535,000 MyShare Bonuses between December 7, 2019 and May 15, 2020. Yet, there are only two MyShare Bonus payments in his extrapolation period.[44] And between Q4 2015 and Q3 2019, there were on average 43,856 MyShare Bonus payments per plan quarter.[45] Based on this average, there would have been approximately 87,712 MyShare Bonus payments between December 7, 2019 and May 15, 2020, approximately 16 percent of the 535,000 MyShare Bonuses Mr. Toney estimated. Therefore, Mr. Toney extrapolated more than *six times* the alleged damages between December 7, 2019 and May 15, 2020 than would be estimated using the average number of MyShare Bonus payments per plan quarter within the data.

34.    In addition to the errors in Mr. Toney's methodology and use of data, Mr. Toney's declaration contains typographical errors that call into question the accuracy of his opinions. Mr. Toney incorrectly describes the data as containing 1,260,000 MyShare Bonus payments through January 2017, when that count includes payments through December 2019.[46] Instead, there are 646,528 MyShare Bonus payments from the beginning of the data through January 2017. Mr. Toney also states there were "approximately 574,000" payments coded as "D."[47] It is likely he meant approximately

---

[42] It is my understanding that Walmart objects to the class continuing past the cut-off date stated in Section 10 of the Class Notice – November 25, 2019.

[43] Toney May, pp. 6-7.

[44] Q4 2020, Q1 2021, and only part of Q2 2021 are between December 7, 2019 and May 15, 2020.

[45] This is for MyShare Bonus payments that had an accompanying overtime payment. [Evans_Opt Outs_WINs.xlsx; Evans_Wage Statement Class_California Stores.xlsx; Payroll Data.]

[46] Payroll Data; Toney May, p. 6.

[47] Toney May, p. 8.

13

5,740,000 payments coded as "D" because there are 5,739,016 "D" payments in the Wage Statement Data. Mr. Toney also incorrectly refers to DOC002035 as the Payroll Data in Section 6 of his declaration. This file actually contains Wage Statement Data. The Wage Statement Data do not contain information on the MyShare Bonus payments as he says.[48]

## V. MR. TONEY HAS CHANGED HIS OPINION ABOUT DAMAGES AND PENALTIES, AGAIN

35. Across the three declarations he produced in the Evans matter, Mr. Toney presented four different methods for calculating the adjusted overtime amount associated with the quarterly MyShare Bonus payment.[49] **Exhibit 7** presents the different methods used by Mr. Toney to calculate allegedly underpaid overtime. Each method has key differences across a range of calculation components. Mr. Toney has changed what he considers to be the correct pay periods to analyze, the straight time and over time amounts to include, and the multiplier to use to calculate what he alleges to be the correct adjusted overtime and double time payments for the MyShare Bonus. In every declaration, he proposes a new method without explaining why, in is his expert opinion, the new method is the appropriate approach to calculate damages and why his prior methods are no longer correct. His May declaration is no different. Mr. Toney has changed his approach to calculating overtime damages with every declaration, which leaves me uncertain about the reliability of his opinion in his May declaration.

36. With respect to calculating wage statement penalties, Mr. Toney also presents differing opinions across his declarations. In his December declaration, Mr. Toney concludes that a wage statement penalty is applicable to each wage statement in the year because associates allegedly did not have the option to receive paper wage statements.[50] In his May declaration, Mr. Toney only considers electronic checks, the check type of "D," as eligible for a wage statement penalty.[51] In addition, in his December declaration, Mr. Toney acknowledges that pay periods with both allegedly underpaid overtime and an electronic wage statement should only receive a single

---

[48] The Wage Statement Data contain information on whether a check was a paper or electronic check and nothing about the pay types included in each check.

[49] Toney October, pp. 4-6; Toney December, pp. 4-5; Toney May, pp. 5-6.

[50] "In addition to the incentive periods, a paystub penalty is applicable for each pay period during the year as it is my understanding that employees did not have the option to receive paper paystubs." [Toney December, p. 5.]

[51] "For the purpose of penalty calculations, checks coded as 'D' will be considered to have a penalty due." [Toney May, p. 8.]

penalty.[52]  However, in his May declaration he calculates the wage statement penalties related to allegedly unpaid overtime and the electronic wage statements separately, likely double counting penalties in pay periods with both an allegedly underpaid overtime payment and an electronic wage statement.[53]  Mr. Toney did not calculate pay stub penalties for Plaintiff Evans in his December declaration even though he had the data to do so.  In addition, Mr. Toney did not acknowledge or discuss wage statement penalties in his October declaration.

37.  Finally, Mr. Toney's May declaration is the first to contain an estimate of PAGA penalties.  Although Mr. Toney had the data to estimate alleged PAGA penalties for Plaintiff Evans, neither of his prior declarations contained estimates for the PAGA penalties related to Mr. Evans's alleged wage statement penalties.

## VI.  EVIDENCE SUPPORTS THE CONCLUSION THAT WALMART OVERPAID ASSOCIATES' MYSHARE BONUS OVERTIME PAYMENTS

38.  Mr. Toney's most recent method for calculating overtime payments related to the MyShare Bonus corresponds to the flat sum bonus regular rate formula.[54]  He said in deposition that this formula was given to him by Plaintiffs' counsel.[55]  However, Mr. Toney did not provide any evidence in his declaration that the MyShare Bonus is a flat sum bonus.

39.  In his declaration, Mr. Toney provided an example of his unpaid overtime calculation using the flat sum bonus method.[56]  In his example, Mr. Toney calculated the alleged overtime adjustment for one associate's MyShare Bonus payment.[57]  He did not demonstrate how he would calculate overtime for all of this associate's MyShare Bonuses.  He also did not show his calculations for named Plaintiff Evans's MyShare Bonuses.

---

[52] "In those periods that contain an issue with both incentive payments and paper paystubs, a single penalty applies." [Toney December, p. 5.]

[53] Neither Section 6 or Section 7 mentions the possibility of double counting penalties. [Toney May, pp. 4-9.]

[54] The California Division of Labor Standards Enforcement ("DLSE") presents two methods for calculating the overtime payment for bonuses.  One method is for a flat sum bonus.  The other is for a production bonus.  [See, https://www.dir.ca.gov/dlse/faq_overtime.htm.]

[55] Toney June Deposition, 48:15-50:5.

[56] Toney May, p. 6.

[57] Toney May, p. 6.

40.   In Walmart's statement of uncontroverted facts from its Motion for Partial Summary Judgment ("MPSJ"), evidence is presented that the MyShare Bonus is determined by a formula other than a flat amount.[58]  Therefore, the relevant DLSE formula for calculating the regular rate and overtime for the MyShare Bonus is the production bonus methodology.[59]  **Exhibit 8**, which is replicated from the MPSJ, demonstrates the DLSE regular rate and overtime calculation for named Plaintiff Evans.  Comparing the DLSE payment amount to the amount Mr. Evans received from Walmart shows that the named Plaintiff was overpaid by Walmart in all cases where he earned overtime during the quarter, as opposed to underpaid as Plaintiffs allege.

41.   The results are the same for the associate who Mr. Toney selected to demonstrate his unpaid overtime calculation.  **Exhibit 9** presents the DLSE regular rate and overtime calculation for this associate.  Between September 13, 2013 and November 29, 2015, this associate received nine MyShare Bonus payments.  For all eight overtime payments for which the Weekly Hours Data were available for the entire quarter, Walmart overpaid this associate compared to the DLSE payment.  The largest single overpayment received by this associate was $15.42.  The results for this associate support the conclusion that Walmart overpaid associates' MyShare Bonus overtime payments as opposed to having underpaid as claimed by Plaintiffs.


Signed this 6th day of July, 2020:



_____

Elizabeth H. Newlon

---

[58] Defendant Wal-Mart Stores, Inc,'s Notice of Motion and Motion for Partial Summary Judgment, filed January 24, 2020, pp. 4-5.

[59] "When a bonus is based on a percentage of production or some formula other than a flat amount… the overtime 'premium' on the bonus is half-time or full-time (for double time hours) on the regular bonus rate. The regular bonus rate is found by dividing the bonus by the total hours worked during the period to which the bonus applies. The total hours worked for this purpose will be all hours, including overtime hours." [The 2002 Update Of The DLSE Enforcement Policies and Interpretations Manual (Revised), Section 49.2.4.]

# NERA
Economic Consulting

National Economic Research Associates, Inc.
Suite 1950
777 South Figueroa Street
Los Angeles, California 90017
+1 213 346 3000 Fax +1 213 346 3030
Direct dial: +1 213 346 3019
elizabeth.newlon@nera.com
www.nera.com

# ELIZABETH HART NEWLON
## DIRECTOR

Dr. Newlon has extensive expertise applying economics and statistics to matters relating to labor and antitrust litigation. During her 15 years as an economic consultant and testifying expert, she has prepared expert reports, testified, and consulted on matters involving a wide range of topics related to FLSA, state labor law, and antitrust law violations, including allegations of wage suppression. Dr. Newlon has analyzed labor and antitrust claims in individual and class/collective actions (addressing questions at certification, liability, and damages phases). In addition to her knowledge of economic and statistical analyses, she also has experience building large and complex databases from diverse sources to address market-wide economic questions.

In labor litigation, Dr. Newlon has significant experience with contractor misclassification and joint-employer claims. She has performed damages calculations for wage and hour allegations under FLSA and state labor laws, including extensive experience with violations of California labor statutes resulting in unpaid overtime, incorrect regular-rate calculation, missed meal penalties, timesheet rounding bias, and waiting-time and itemization penalties. Dr. Newlon also has significant experience analyzing pay disparities by gender and race for internal audits and litigation. Moreover, Dr. Newlon has assessed economic losses in single-plaintiff matters related to alleged wrongful termination, injury, and incarceration.

At the nexus of labor and antitrust litigation, Dr. Newlon has significant experience evaluating allegations of compensation suppression by employers. She has assisted clients in a range of industries including high tech, childcare, and healthcare. Dr. Newlon has also analyzed antitrust claims related to collusive agreements, price fixing, and foreclosure.

Prior to entering private practice, Dr. Newlon was an Assistant Professor of Economics at the University of Kentucky, where she taught graduate classes in equilibrium theory and undergraduate classes in microeconomics. Her university research focused on the optimal provision of public goods, such as education and policing. Dr. Newlon has published articles on these subjects and has presented her work at various professional economic conferences and special seminars.

MMC  Marsh & McLennan Companies

Exhibit I
Dr. Elizabeth Newlon

## Education

**Carnegie Mellon University**
Ph.D., Economics, Tepper School of Business, 2001

**Carnegie Mellon University**
M.S., Economics, Tepper School of Business, 1994

**The Ohio State University**
B.S., Economics, 1993

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| 2018 | Director |
| 2012-2017 | Vice President – Associate Director |
| 2007-2012 | Senior Consultant |
| 2006-2007 | Consultant |

**Navigant Consulting**

| | |
|---|---|
| 2005 | Managing Consultant |

**Welch Consulting**

| | |
|---|---|
| 2003-2005 | Economist |

**University of Kentucky**

| | |
|---|---|
| 2000-2002 | Assistant Professor, Gatton College of Business and Economics |

## Retained as Expert and Expert Testimony

*James S. Evans v. Wal-Mart Stores, Inc.*, United States District Court for the Central District of
California, Case No. CV 17-07641-AB (KKx).
*Declaration* submitted on January 15, 2020 for Wal-Mart, Inc. in rebuttal to Plaintiff's
Expert's damages declaration.

*Clergy Community Coalition v. Premier Health Partners,* U.S. Department of Health and Human
Services - Office for Civil Rights, Transaction No. 18-305219.
*Report* submitted on November 10, 2013 for Premier Health addressing Plaintiffs' disparate
impact allegations under Title VI and Affordable Care Act.

Exhibit 1
Dr. Elizabeth Newlon

*Luis Ruano and Leticia Ruano v. Los Angeles Unified School District, et al.*, Superior Court of
the State of California, County of Los Angeles, Case No. BC677331.
*Report* submitted for LAUSD addressing Plaintiff's Expert's damages estimates, signed
September 10, 2019. *Deposition testimony* on September 13, 2019.

*Jimmy H. Thomas and Sony Thomas v. Akzo Nobel Coatings, Inc., et al.*, Superior Court of the
State of California, County of Alameda, Case No. RG 17882514.

*Susan Teasley v. Equinor US Holdings, Inc.,* American Arbitration Association, Case No. 01-18-
0002-1427.
*Report* submitted on June 28, 2019 for Equinor US Holdings addressing Plaintiff's
discrimination allegations. *Arbitration testimony* on November 1, 2019.

*Jeffrey Cox v. Roadrunner Intermodal Services, LLC, et al.*, United States District Court for the
Eastern District of California, Case No. 1:17-CV-01207-DAD-BAM.
*Report* submitted on April 12, 2019 for Roadrunner Intermodal Services addressing
Plaintiffs' Expert's damages estimates.

*Cassandra Enochs v. Behavioral Autism Therapies, LLC, et al.*, Superior Court of the State of
California, County of San Bernardino, Case No. 1719939.
*Affidavit* submitted for Behavioral Autism Therapies for mediation on October 31, 2018.

*Consulting expert* on compensation equity audit for high-tech company, August 2018 to present.

*Consulting expert* on compensation equity audit for multinational consulting company, June
2018 to August 2018.

*Chelsea Hamilton, et al. v. Wal-Mart Stores, Inc., et al.*, United States District Court for the
Central District of California, Case No. 5:17-cv-01415 AB (KKx).
*Declaration* submitted for Wal-Mart, Inc. addressing Plaintiffs' and Plaintiffs' Expert's
proposed methodologies to analyze liability and damages, filed on July 13, 2018. *Deposition
testimony* on July 30, 2018. *Declaration* submitted for Wal-Mart, Inc. in rebuttal to
Plaintiffs' Expert's damages declaration on October 22, 2018.

*Juan Garcia v. Wal-Mart Stores, Inc.*, United States District Court for the Central District of
California, Case No. 5:16-CV-01645 TJH (RAOx).
*Declaration* submitted for Wal-Mart, Inc. addressing Plaintiff's Expert's proposed
methodologies to analyze liability and damages, filed on April 16, 2018. *Deposition
testimony* on May 7, 2018. *Reply Declaration* submitted on June 7, 2018. *Rebuttal
declaration* submitted on May 6, 2019 in response to Plaintiff's expert's declaration.
*Deposition testimony* on May 23, 2019.

*Stephanie Cekov v. Pitzer College*, Superior Court of the State of California, County of
Sacramento, Case No. BC682871.
*Consulting expert* for Pitzer College from April 2018 to June 2018.

NERA Economic Consulting                                                                                  3

Exhibit I
Dr. Elizabeth Newlon

*Mr. Benjamin Harris v. Vision Service Plan,* Superior Court of the State of California, County of
Sacramento, Case No. 34-2016-00189041.
*Report* submitted for Vision Service Plan addressing Plaintiff's Expert's damages estimates,
signed December 21, 2017. *Deposition testimony* on January 4, 2018.

*Fluegel, et al. v. FedEx Corporation, et al.,* United States District Court for the Northern District
of Illinois, Case No. 1:05-cv-02326. *Consulting Expert* for FedEx Ground from October 2017
to August 2018.

*Laura Ann DeCrescenzo v. Church of Scientology International, et al.,* Superior Court of the
State of California, County of Los Angeles, Case No. BC411018.
*Report* submitted in opposition to Plaintiffs' Expert's report estimating Plaintiff's alleged lost
wages, August 8, 2017.

*Consulting expert* for FedEx Ground Package Systems on wage and hour matter in the United
States District Court for the District of New Jersey from August 2017 to present.

*Consulting expert* for FedEx Ground Package Systems on wage and hour matter in the United
States District Court for the District of New Mexico from August 2017 to present.

*Johana Paola Beltran, et al. v. InterExchange, Inc., et al.,* United States District Court for the
District of Colorado, Case No. 14-cv-03074-CMA-KMT.
*Report* submitted in opposition to certification of the labor class and collective actions,
signed January 13, 2017. Class and collective actions rebuttal *report* submitted, signed
February 3, 2017. *Deposition testimony* on April 12, 2017. Merits and damages *report*
submitted, signed July 31, 2017. Merits and damages rebuttal *report* submitted, signed
October 30, 2017. *Deposition testimony* on March 9, 2018.

*Eillen Voellinger v. Sumo Logic,* Superior Court of the State of California, County of San Mateo,
Case No. 16CIV00371.
*Declaration* submitted in opposition to Plaintiffs' Motion to Quash Defendant's Subpoena
for Records, signed January 17, 2017.

*Nikmanesh, et al. v. Wal-Mart Stores, Inc., et al.,* United States District Court for the Central
District of California, Southern Division, Case No. 8:15-CV-00202-AG-JCG.
*Declaration* submitted in opposition to Plaintiffs' Expert's proposed use of timekeeping and
alarm data, signed November 7, 2016. *Report* served to Plaintiffs on April 24, 2017.

*Consulting expert* for FedEx Ground Package Systems on wage and hour matter in New York
State Court from April 2016 to present.

*Consulting expert* for FedEx Ground Package Systems on wage and hour matter in the United
States District Court for the Western District of New York from April 2016 to present.

*Clyde E. Woomer, et al. v. FedEx Ground Package System, Inc.,* Court of Common Pleas of
Allegheny County, Pennsylvania, No. GD 05-020678.
*Consulting Expert* for FedEx Ground from January 2016 to October 2018.

Exhibit 1
Dr. Elizabeth Newlon

*Woomer vs. Fedex Ground Package System Inc.*, Court of Common Pleas of Allegheny County, Pennsylvania, No. GD-05-020678.
*Consulting Expert* for FedEx Ground from December 2015 to May 2017.

*Consulting Expert* for numerous cases in the MDL, In re FedEx Ground Package System, Inc., *Employment Practices Litigation*, Case No. 3:05-md-527-RM, (MDL-1700), in the United States District Court for the Northern District of Indiana:

*Dean Alexander, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00528-RLM-CAN (**CA**), from November 2014 to June 2015.

*Lawrence Asbury, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:06-cv-00826-RLM-CAN (**WV**), from August 2015 to June 2016.

*Ryan Boudreaux, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00193-RLM-CAN (**LA**), from August 2015 to June 2016.

*Donald E. Carlson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00664-RLM-CAN (**FL**), from February 2015 to November 2015.

*Gregory Cooke, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00668-RLM-CAN (**SC**), from August 2015 to June 2016.

*Daniel Fishler, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00053-RLM-CAN (**UT**), from August 2015 to June 2016.

*Tina Floyd v. FedEx Ground Package System, Inc.*, Civil No. 3:06-cv-00428-RLM-CAN (**AL**), from August 2015 to June 2016.

*Margaret Gibson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00272-RLM-CAN (**AZ**), from August 2015 to June 2016.

*John Humphreys, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00540-RLM-CAN (**TX**), from August 2015 to June 2016.

*Paul Kelly, et al. v. FedEx Ground Package System, Inc.*, Civil No. 5:08-cv-01225-RLM-CAN (**OH**), from August 2015 to June 2016.

*Gary Lee Larson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00601-RLM-CAN (**WI**), from August 2015 to June 2016.

*Katrina Lee, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00533-RLM-CAN (**MN**), from August 2015 to June 2016.

*Larry Louzau, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00538-RLM-CAN (**NY**), from August 2015 to June 2016.

Exhibit 1
Dr. Elizabeth Newlon

*Roger Riewe, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00390-RLM-CAN (**IN**), from August 2015 to June 2016.

*Edward Slayman, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00596-RLM-CAN (**OR**), from November 2014 to September 2015.

    In combination with the follow-on cases:

        *Jon Leighter, et al. v. FedEx Ground Package System, Inc.*, Case No. 3:07-cv-00818-KI

        *Christopher Cordova, et al. v. FedEx Ground Package System, Inc.*, Case No. 3:14-cv-01663

*Arthur Smith, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00600-RLM-CAN (**TN**), from August 2015 to June 2016.

*Raymond Tierney, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00599-RLM-CAN (**RI**), from August 2015 to June 2016.

*Michael Tofaute, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00595-RLM-CAN (**NJ**), from August 2015 to June 2016.

*Thomas Westcott v. FedEx Ground Package System, Inc.*, Civil No. 3:06-cv-00485-RLM-CAN (**MD**), from August 2015 to June 2016.

*Earnest White, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00411-RLM-CAN (**GA**), from August 2015 to June 2016.

*Sharon B. Whiteside, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00326-RLM-CAN (**NC**), from August 2015 to June 2016.

*Derek D. Willis v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00597-RLM-CAN (**PA**), from August 2015 to June 2016.

*Sheldrick McNeal, Sr. v. Nucor Steel Tuscaloosa, Inc.*, United States District Court for the Northern District of Alabama, Western Division, Civil Action No. 7:15-cv-01305-LSC. *Consulting Expert* in single plaintiff discrimination case, from April 2016 to June 2016.

*Deanna Matthews v. Sutter West Bay Hospitals, Inc.*, Superior Court of the State of California, County of Marin, Case No. CIV1303547.
Retained as *Testifying Expert* in single plaintiff wrongful termination case, February 2016.

*David Daniels v. Sutter West Bay Hospitals, Inc.*, Superior Court of the State of California, County of Marin, Case No. CIV1304891.
Retained as *Testifying Expert* in single plaintiff wrongful termination case, October 2015.

**Exhibit 1**
Dr. Elizabeth Newlon

*Greggory R. Devore, M.D., a Medical Corporation v. Heritage Provider Network, Inc., et al.,*
Superior Court of the State of California, County of Los Angeles, Case No. BC484067.
*Consulting Expert* for antitrust case related to damages from termination of physician's
contract, from October 2014 to August 2015.

*Monet Alvarez v. M.A.C Cosmetics Inc.*, Superior Court of the State of California, County of
Orange, Case No. 30-2014-00750745.
*Consulting Expert* in class-action wage and hour matter related to allegations of unpaid work
filed under PAGA, June 2015.

*Michele Castillo v. M.A.C Cosmetics Inc.*, Superior Court of the State of California, County of
Marin, Case No. CIV1402791.
*Consulting Expert* in class-action wage and hour matter related to allegations of unpaid final
wages, June 2015.

*Tina Hamilton, et al. v. NHS Management, L.L.C., et al.*, United States District Court for the
Western District of Missouri, Southwestern Division, Case No. 3:12-cv-05044-JTM.
*Declaration* submitted in support of Defense's motion for decertification, signed November
4, 2014.

*Jerome Davis v. Brown Shoe Company*, United States District Court for the Eastern District of
California, Fresno Division, Case No. 1:13-cv-01211-LJO-BAM.
*Declaration* submitted in opposition to Plaintiff's Statement Re: Discovery Disagreement,
signed September 4, 2014.

*Sean Burke v. Broker Solutions, Inc., et al.*, Superior Court of the State of California, County of
Orange, Case No. 30-2014-00722233-CU-OE-CXC.
*Consulting Expert* in class-action wage and hour matter related to alleged errors in
calculating regular rate, from August 2014 to May 2015.

*Aaron Eubanks v. Wilshire Associates Incorporated,* Superior Court of the State of California,
County of Los Angeles, Case No. BC 483580, ADRS Case No. 13-0178-PLC.
*Expert Report* and *Testimony* at arbitration on February 28, 2014 relating to damages arising
from alleged wrongful termination.

*John Kellenbenz v. Seton Medical Center*, Superior Court of the State of California, County of
San Mateo, Case No. CIV 514600.
*Consulting Expert* in class-action wage and hour matter related to allegations of failure to pay
for all hours worked and unpaid final wages, from February 2013 to July 2013.

*Maral Hintiryan, et al. v. Condusiv Technologies Corporation,* Superior Court of the State of
California, County of Los Angeles, Case No. BC 424 359.
*Consulting Expert* in class-action wage and hour matter related to allegations of incorrect
overtime and double-time payments, pay statement itemization, and waiting-time penalties,
from June 2012 to September 2012.

**Exhibit I**
Dr. Elizabeth Newlon

*Sue A. Leeder v. Secretary of Defense, Leon Panetta,* United States District Court for the Northern District of California, San Jose Division, Case No. C 10-01822-HRL.
*Expert Report* submitted on May 15, 2012 relating to damages arising from alleged wrongful termination.

*Robert A. & Pearl Fletcher v. Commissioner of Internal Revenue; Thousand Oaks Residential Care Home v. Commissioner of Internal Revenue; and Thousand Oaks Residential Home, Inc. v. Commissioner of Internal Revenue,* Federal Tax Court, Docket Nos. 1481-10, 1448-10, and 1480-10.
*Expert Report* and *Trial Testimony* on December 16, 2011 about reasonable compensation for owners of a residential care facility in Southern California.

*Woodson & Rummerfield's House of Design, Inc. v. Lisa Beaulieu (A/K/A Lisa Marie Presley),* before the American Arbitration Association, Western Case Management Center, AAA Case No. 72 529 Y 00894 09 JISI.
*Deposition testimony* on January 19, 2011 about damages incurred by Defendant in relation to dispute about design services provided by Plaintiffs.

*Moshe Marciano, et al. v. Ameriflight, LLC, et al.,* Superior Court of the State of California, County of Los Angeles, Case No. EC045694.
Expert opinion prepared regarding damages for wrongful injury claim prepared for Ameriflight.

*Report* "Assessing the Property Value Impact of Mississippi Cottages," written pro-bono for Mississippi Center for Justice, dated October 10, 2010.

## Experience Working for Other Experts

### *Labor and Wage Suppression Cases:*

» Analysis of class damages and preparation of report in case alleging compensation suppression by seven major tech firms in Silicon Valley.

» Analysis of economic losses due to alleged wrongful termination of five women in financial management positions by a major investment bank.

» Recommendations on a compensation model for clinic medical directors' pay on Part 494 hours worked for a national chain of dialysis clinics.

» Analysis of regular rate calculations for the purpose of assessing overtime and missed meal penalty payments to nurses at a major hospital in Southern California.

» Analysis of economic losses due to alleged wrongful termination by Verizon Wireless, Inc.

» Analysis of compensation and promotion practices of a major aero-space company with respect to claims of gender discrimination in compensation and promotion.

» Audit of differences in compensation by gender and race for group of financial and business consulting companies.

**Exhibit 1**
Dr. Elizabeth Newlon

» Survey analysis for matter involving claim of misclassification of independent contractors by IRS against a California city.

» Estimated damages in a wrongful termination action against a California software company.

» In a collective action against a technology company, analyzed allegation that older workers were more likely to be discharged through reductions in force.

» Estimated damages in a wrongful imprisonment action against City police in Massachusetts.

» Analysis of economic losses due to alleged wrongful termination by Diagnostic Products Corporation.

*Antitrust and Intellectual Property Cases:*

» Modeling of Arizona dentists' incentives to join competing carriers' networks and analysis of NetMinder provider network affiliation data.

» Analysis of foreclosure claims by Orthopedic Spine Surgeon against Hospital in Santa Barbara and competing Neurosurgeons.

» Analysis of antitrust liability associated with claims of foreclosure and tying in a case relating to physician privileges at a general acute care hospital in California.

» Analysis of class action nursing monopsony claims against a major hospital association relating to the wage effect of a price ceiling on bill rates for nursing services.

» Valuation of future royalties of a pharmaceutical product for an intellectual property case.

» Valuation of future royalties of a prosthetic device for an intellectual property case.

» Analysis of claims data for major multi-district litigation related to out-of-network reimbursement of provider claims.

» Analysis of antitrust issues in a case relating to revenue sharing agreements in the retail grocery market, involving analysis of large sales databases and multiple reports.

» Foreclosure and exclusionary bundling case against a large medical manufacturer, related to GPO contracting.

## Presentations

» "No-Poach" Agreement Enforcement: Hot-Buttons in 2020 and Beyond." Knowledge Group Webinar on December 10, 2019.

» "Preliminary Analysis, CAST Data - Labor Trafficked Clients." Presentation to Los Angeles County Department of Public Health on July 15, 2019.

» "How to Effectively Use Expert Evidence in Wage and Hour Litigation: A Comprehensive Guide for 2019." Knowledge Group Webinar on April 25, 2019.

**Exhibit I**
Dr. Elizabeth Newlon

» "Calculating Damages and Modeling Exposure – Covering All the Bases." Presentation at FedEx Ground, Moon Township, PA on March 29, 2019.

» "Preliminary Analysis, CAST Data - Labor Trafficked Clients." Presentation to LA Regional Human Trafficking Task Force's Labor Trafficking Subcommittee on February 14, 2019.

» "Wage and Hour Class Actions: Looking Back and What's Ahead." Knowledge Group Webinar on January 17, 2019.

» "Wage and Overtime Law in the 2018 Landscape: Updates and Developments You Need to Know." Knowledge Group Webinar on August 29, 2018.

» "Blurring the Bright Line of Statistical Significance - The High-Tech Employees Antitrust Litigation." NERA's 36th Antitrust and Trade Regulation Seminar on July 7, 2017.

» "Practical Strategies and Latest Legal Developments in Wage & Hour Litigation and Compliance." Knowledge Group Webinar on June 28, 2017.

» "The EEOC's Proposed Revisions to the EEO-1 Report: Time to Overhaul Your Payroll System?" Knowledge Group Webinar on September 19, 2016.

» "Class Certification in Wage and Hour Cases: How Statistics Can Help." Presentation given at Drinker Biddle and Reath in Century City, CA on May 21, 2014.

» "Post-*Dukes* Developments in Employment Class Actions and the Role of the Economist." Presentation with Betsy Becker and Flavia Bainbridge given at Paul Hastings in Los Angeles, CA on May 7, 2013.

» "Calculating Damages in Wrongful Termination Cases: Reality Matters." Presentation with Kristin Terris given at Mitchell Silberberg & Knupp, LLP in Los Angeles, CA on January 18, 2012.

» "What's in an Average? How to Recognize Misleading Statistics in Employment Cases." Presentation with Betsy Becker given at Jackson Lewis LLP in San Francisco, CA on December 16, 2010.

» "One Size Doesn't Fit All: Calculating Damages in Wrongful Termination Cases." Presentation given at Hill Farrer & Burrill LLP in Los Angeles, CA on January 21, 2010.

» "What's in an Average? How to Recognize Misleading Statistics in Employment Cases." Presentation with Stephanie Plancich given at O'Melveny & Myers LLP in Los Angeles, CA on August 11, 2009.

» "What's in an Average? How to Recognize Misleading Statistics in Employment Cases." Presentation with Kristin Terris and John Johnson given at NERA's CLE Labor Luncheon in Los Angeles, CA on October 23, 2008.

» The Public Choice Society, 2001, 1997, and 1996.

» Harvard University, December 2000.

**Exhibit 1**
Dr. Elizabeth Newlon

» MacArthur Group on Poverty and Inequality, March 2000.

» Stanford Institute for Theoretical Economics (SITE), seminars on Competition in Urban Economics, July 1998.

» The National Tax Association, 1997.

## Publications

» "Life After Tyson: A New Demand for Expert Counterstudies," with Sarah Butler and Bryan Tomlin, *Law360*, March 29, 2016.

» "Top Five Things You Should Know about the EEOC's Proposed Changes to the Employer Information Report," Online Legal Blog, Suits by Suits, presented by Zuckerman Spaeder LLP, March 25, 2016.

» "Revenue Sharing Agreements: Do They Restrict Competition?," with Kristin Terris and Thomas McCarthy, *ABA Antitrust Law, Economics Committee Newsletter*, Vol. 10, No. 1, Summer 2010.

» "Implications of the Fair Pay Act for Statistical Analysis in Wage Discrimination Suits," with Chris Erath and Denise Martin, March 2009.

» "Ability Tracking, School Competition, and the Distribution of Economic Benefits," with Dennis Epple and Richard Romano, *Journal of Public Economics*, January 2002.

» "The Effects of Educational Vouchers when Schools Track Students by Ability," with Dennis Epple and Richard Romano, *Environmental and Public Economics: Essays in Honor of Wallace E. Oates* (Arvind Panagariya, Paul R. Portney, and Robert M. Schwab, eds.), Edward Elgar Publishing, 1999.

July 2020

Exhibit 2

## Materials Considered by Dr. Elizabeth Newlon

**Court Filings**

*James S. Evans, on behalf of himself, all others similarly situated, Plaintiffs, vs. Wal-Mart Stores, Inc., a Delaware corporation; and DOEs 1 through 50, inclusive, Defendants.* United States District Court, Central District of California, Case No. 2:17-cv-7641-AB-KK:

Plaintiff's Sur-Reply in Opposition to Defendant Wal-Mart Stores, Inc.'s Motion for Partial Summary Judgment, February 21, 2020

Defendant Wal-Mart Stores, Inc.'s Reply in Support of Motion for Partial Summary Judgment, February 14, 2020

Defendant Wal-Mart Stores, Inc.'s Reply in Support of Motion to Decertify the Wage Statement and Regular Rate Classes, February 14, 2020

Notice of Withdrawal of Declarations of Denzel Watson and Joaquin Sedillo, February 14, 2020

Walmart's Appendix of Evidence in Support of Walmart's Reply RE Motion for Partial Summary Judgment, February 14, 2020

Walmart's Opposition to Plaintiff's Request for Judicial Notice, February 14, 2020

Plaintiff's Opposition to Defendant Wal-Mart Stores, Inc.'s Motion for Partial Summary Judgment, February 7, 2020

Plaintiff's Opposition to Motion for Decertification, February 7, 2020

Plaintiff's Request for Judicial Notice in Support of Plaintiff's Opposition to Defendant Wal-Mart Stores, Inc.'s Motion for Partial Summary Judgment, February 7, 2020

Defendant Wal-Mart Stores, Inc.'s Notice of Motion and Motion to Decertify the Wage Statement and Regular Rate Classes; Memorandum of Points and Authorities, January 31, 2020

[Proposed] Order Granting Walmart Inc.'s Motion to Strike Expert Report and Bar Testimony of Plaintiff's Proffered Expert James Toney, January 31, 2020

Appendix of Evidence in Support of Walmart's Notice of Motion and Motion for Partial Summary Judgment, January 24, 2020

Defendant Wal-Mart Stores, Inc.'s Notice of Motion and Motion for Partial Summary Judgment; Memorandum of Points and Authorities, January 24, 2020

Defendant Walmart Inc.'s Statement of Uncontroverted Facts in Support of Motion for Partial Summary Judgment, January 24, 2020

1

Exhibit 2

Stipulation to Disseminate Class Notice, January 10, 2020

Order Granting Motion to Stay Proceedings with Respect to Count VI and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, November 25, 2019

Joint Stipulation to Dismiss Without Prejudice Plaintiff Keineisha Smith Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), November 14, 2019

Plaintiffs' Reply in Support of Motion for Class Certification, October 1, 2019

Plaintiffs' Request for Judicial Notice in Support of Reply in Support of Motion for Class Certification Filed Conditionally Under Seal, October 1, 2019

Notice of Errata Regarding Defendant Walmart's Brief in Opposition to Plaintiffs' Motion for Class Certification, September 25, 2019

Appendix of Evidence in Support of Walmart's Appendix of Evidence Submitted in Support of Its Opposition to Plaintiffs' Motion for Class Certification, September 3, 2019

Defendant Walmart's Brief in Opposition to Plaintiffs' Motion for Class Certification, September 3, 2019

Notice of Errata and Correction to Plaintiffs' Notice of Motion and Motion for Class Certification [Redacted] Filed Conditionally Under Seal, July 24, 2019

Plaintiffs' Amended Notice of Motion for Class Certification [Redacted] Filed Conditionally Under Seal, July 23, 2019

Memorandum of Points and Authorities, July 22, 2019

Plaintiffs' Application for Leave to File Under Seal Portions of Its Motion for Class Certification and Designated Exhibits Attached to the Declaration of William M. Pao, July 22, 2019

Plaintiffs' Notice of Motion and Motion for Class Certification [Redacted] Filed Conditionally Under Seal, July 22, 2019

[Proposed] Order Granting Class Certification, filed July 22, 2019

Wal-Mart Stores, Inc.'s Answer to Plaintiff's First Amended Complaint, January 8, 2018

First Amended Complaint, November 13, 2017


**Declarations**

Declaration of James Evans, February 7, 2020

2

**Exhibit 2**

Declaration of James Evans, July 22, 2019

Declaration of Robert J. Herrington in Support of Defendant Walmart Inc.'s Reply in Support of Its Motion for Partial Summary Judgment, February 14, 2020

Declaration of Robert J. Herrington in Support of Defendant Walmart Inc.'s Notice of Motion and Motion for Partial Summary Judgment, January 24, 2020

Declaration of Robert J. Herrington in Support of Walmart's Opposition to Plaintiffs' Motion for Class Certification, September 3, 2019

Declaration of Diana McChristian in Support of Defendant Walmart Inc.'s Motion for Partial Summary Judgment, January 24, 2020

Declaration of Diana McChristian in Support of Defendant Walmart Inc.'s Opposition to Plaintiffs' Motion for Class Certification, August 29, 2019

Declaration of Elizabeth Newlon, January 24, 2020

Supplemental Declaration of William M. Pao in Support of Plaintiff's Opposition to Defendant Wal-Mart Stores, Inc.'s Motion for Partial Summary Judgment, February 21, 2020

Declaration of William M. Pao in Support of Plaintiff's Opposition to Defendant Wal-Mart Stores, Inc.'s Motion for Partial Summary Judgment, February 7, 2020

Declaration of William M. Pao in Support of Plaintiff's Reply in Support of Motion for Class Certification [Redacted] Filed Conditionally Under Seal, October 1, 2019 and accompanying exhibits

Declaration of William M. Pao in Support of Plaintiff's Motion for Class Certification [Unredacted] Filed Conditionally Under Seal, July 22, 2019 and accompanying exhibits

Declaration of Kole Scully-Mims, February 7, 2020

Declaration of Shaun Setareh in Support of Plaintiff's Motion for Class Certification Filed Conditionally Under Seal, July 22, 2019

Declaration of James Toney, May 15, 2020 and accompanying work papers

Declaration of James Toney, December 16, 2019

Declaration of James Toney, October 1, 2019


**Depositions**

Deposition of James Evans, June 25, 2020 and accompanying exhibits

3

**Exhibit 2**

Deposition of James Evans, August 19, 2019 and accompanying exhibits

**Bates Stamped Documents**

DOC000001-DOC000015

DOC000814

DOC000815

DOC000816

DOC000817

DOC000818

DOC000819-DOC000821

DOC000822-DOC000927

DOC000980-DOC000992

DOC000993-DOC001005

DOC001006-DOC001020

DOC001021-DOC002021

DOC001077

DOC002024-DOC002033

DOC002035

**Data**

Evans_Opt Outs_WINs.xlsx

Evans_Wage Statement Class_California Stores.xlsx

*WIN*_EarningsHist.xlsx [where *WIN* is the WIN for each of 123,890 associates]

4

**Exhibit 2**

**Publicly Available Information**

State of California, Department of Industrial Relations, Labor Commissioner's Office, Overtime.
    https://www.dir.ca.gov/dlse/faq_overtime.htm. Accessed January 14, 2020.

The 2002 Update Of The DLSE Enforcement Policies and Interpretations Manual (Revised).

5

Exhibit 3



### Distribution of James Toney's Calculation of
### Underpayment and Overpayment of MyShare Bonus Overtime
### On 173,041 Matched MyShare Bonus Payments

Note: There are 2,167 observations with an underpayment of less than -$4 that are not displayed on this chart.
Source: Payment comparison.xlsx

**James Toney's Penalty Amount**
**Quarters Analyzed by Mr. Toney**
**During Wage Statement SOL**

Exhibit 4



Sources:  Toney May, p. 7.
          Toney Work Papers.

Exhibit 5

**Example of James Toney's Methodology**
**Matching Weekly Hours Data to Payroll Data**
**WIN 100465504, MyShare Bonuses of $165**

| Weekly Hours Data | | Payroll Data | |
|---|---|---|---|
| Incentive Period End Date | Total of Weekly MyShare Bonus Amounts | Payroll Run Date | MyShare Bonus Amounts |
| (1) | (2) | (3) | (4) |

| Quarters from Weekly Hours Data with MyShare Bonuses of $165* | | MyShare Payments of $165 from Payroll Data | |
|---|---|---|---|
| 7/24/2015 | $ 165 | 9/6/2015 | $ 165 |
| 1/22/2016 | 165 | 11/29/2015 | 165 |
| | | 3/6/2016 | 165 |

| Toney's Matching Methodology: 6 Matches | | | |
|---|---|---|---|
| 7/24/2015 | $ 165 | 9/6/2015 | $ 165 |
| 1/22/2016 | 165 | 11/29/2015 | 165 |
| 7/24/2015 | 165 | 3/6/2016 | 165 |
| 1/22/2016 | 165 | 9/6/2015 | 165 |
| 7/24/2015 | 165 | 11/29/2015 | 165 |
| 1/22/2016 | 165 | 3/6/2016 | 165 |

Note:
  * The incentive period ending on October 30, 2015 also had a MyShare Bonus amount of $165, but Toney incorrectly calculated the MyShare Bonus amount for this quarter.

Sources: 100465504_EarningsHist.xlsx.
         DOC002024-DOC002033.
         Toney Work Papers.

**Exhibit 6**

## Updates to James Toney's Overtime Damage Estimate

| Update to Toney's Estimate (1) | Count of Observations in Toney's Analysis (2) | Average Underpayment[1] (3) | Count of MyShare Bonus Payments in Payroll Data Period (4) | Overtime Damages[2] (5) (3) * (4) |
|---|---|---|---|---|
| Toney's Original Estimate | 173,041 | $ 0.26 | 1,256,594 | $ 326,714 |
| Excluding Data Outside of Data Period Toney Claims to be Analyzing[3] | 172,674 | $ 0.26 | 1,222,991 | $ 317,978 |
| Excluding Observations that are Incorrect Matches by Toney | 170,245 | $ 0.25 | N/A | $ 305,748 |
| Excluding MyShare Bonuses that are Not Accompanied by an OVERTIME/INCT Payment | N/A | N/A | 1,117,450 | $ 279,363 |
| Excluding Opt-Outs | 170,119 | $ 0.25 | 1,116,617 | $ 279,154 |
| Excluding Stores Outside of CA and Sam's Club, Distribution Center, and Fulfillment Center Locations | 166,388 | $ 0.22 | 1,083,717 | $ 238,418 |

Notes:

[1] The average underpayment has been rounded to two decimal points to be consistent with Toney's methodology.

[2] Overtime damages are calculated using the prior row's average underpayment or count of MyShare Bonus payments in Payroll Data period if they are missing for an updated item.

[3] Toney analyzes the Weekly Hours Data through Q4 2017, but merges in Payroll Data through the entire data period. He also includes MyShare Bonus payments from the Payroll Data that were paid on September 8, 2013, which is prior to the start of the regular rate class.

Sources: Evans_Opt Outs_WINs.xlsx.
Evans_Wage Statement Class_California Stores.xlsx.
Payroll Data.
Toney May, pp. 4-6.
Toney Work Papers.

Exhibit 7

**Summary of James Toney's Four Overtime Calculation Methodologies**

| Toney Declaration | Pay Periods Analyzed | Regular Rate | | Multiplier | Overtime Hours | Overtime Amount Paid by Walmart Toney Considered |
| | | Numerator | Denominator | | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| October 2019, Scenario 1 | Only the pay period on which a MyShare Bonus payment appeared | Regular earnings for the pay period on which the MyShare Bonus payment appeared + MyShare Bonus | Straight time hours worked in the pay period on which the MyShare Bonus payment appeared | 1.5 x overtime hours | Overtime hours in the pay period on which the MyShare Bonus payment appeared | "OVERTIME/INCT"[2] + "OVERTIME EARN" in the pay period on which the MyShare Bonus payment appeared |
| October 2019, Scenario 2 | Only pay periods with overtime during MyShare Bonus period[1] | Regular earnings for the pay periods with overtime during the MyShare Bonus period + MyShare Bonus | Straight time hours worked in the pay periods with overtime during the MyShare Bonus period | 1.5 x overtime hours | All overtime hours worked during MyShare Bonus period | "OVERTIME/INCT"[2] + "OVERTIME EARN" in the pay periods with overtime during the MyShare Bonus period |
| December 2019 | All pay periods during MyShare Bonus period[1] | MyShare Bonus | All straight time hours in the MyShare Bonus period | 0.5 x overtime hours 1.0 x double time hours | All overtime hours worked during MyShare Bonus period | Does not state |
| May 2020 | All pay periods during MyShare Bonus period[1] | MyShare Bonus | All straight time hours in the MyShare Bonus period | 1.5 x overtime hours 2.0 x double time hours | All overtime hours worked during MyShare Bonus period | "OVERTIME/INCT"[2] |

Notes:
[1] The MyShare Bonus period is the 12 or 14 weeks over which the MyShare Bonus payment is earned.
[2] "OVERTIME/INCT" is the pay code for an adjusted overtime payment. For this analysis, only adjusted overtime payments associated with the MyShare Bonus payments are considered.

Sources: Toney December.
Toney May.
Toney October.

Exhibit 8

**Evans v. Walmart**

**Hypothetical Overtime Adjustment Calculation by Quarter for James Evans**
**Using DLSE Regular Rate Adjustment Calculation for Production Bonus**

| Quarter | MyShare Bonus | Hours | | Overtime Premium | Adjusted Overtime Payment | | |
| | | Total | Overtime | | DLSE | Walmart | Difference |
| (1) | (2) | (3) | (4) | (5) | (6) (2)/(3)*(4)^(5) | (7) | (8) (7)-(6) |
| 2014 Q3 | $ 128.12 | 143.2 | 0.0 | 0.5 | $   - | $   - | $   - |
| 2014 Q4 | 151.41 | 427.1 | 0.2 | 0.5 | 0.04 | 0.11 | 0.07 |
| 2015 Q1 | 265.29 | 385.7 | 6.4 | 0.5 | 2.19 | 5.41 | 3.22 |
| 2015 Q4 | 309.32 | 401.3 | 1.9 | 0.5 | 0.74 | 2.16 | 1.42 |
| 2016 Q1 | 203.53 | 365.9 | 0.6 | 0.5 | 0.16 | 0.46 | 0.30 |
| 2016 Q2 | 76.04 | 432.3 | 0.8 | 0.5 | 0.07 | 0.19 | 0.12 |
| 2016 Q3 | 198.85 | 504.7 | 0.2 | 0.5 | 0.04 | 0.11 | 0.07 |
| 2016 Q4 | 368.28 | 424.0 | 0.4 | 0.5 | 0.19 | 0.51 | 0.32 |
| 2017 Q1 | 110.25 | 525.4 | 1.8 | 0.5 | 0.18 | 0.56 | 0.38 |
| 2017 Q2 | 155.31 | 408.1 | 2.9 | 0.5 | 0.54 | 1.57 | 1.03 |

Note:  Mr. Evans did not work any overtime in 2014 Q3 after he became eligible for the MyShare Bonus, and thus he did not receive an adjusted overtime payment in that quarter.

Sources:  DOC000003-5.
DOC000814.
DOC000815.
DOC000982-984.
DOC000995-997.
DOC001008-1010.
DOC001077.
https://www.dir.ca.gov/dlse/faq_overtime.htm.

Exhibit 9

**Evans v. Walmart**

**Hypothetical Overtime Adjustment Calculation by Quarter for WIN 217914530**

**Using DLSE Regular Rate Adjustment Calculation for Production Bonus**

| Quarter | MyShare Bonus | Hours | | | Premium | | Adjusted Overtime Payment | | |
| | | Total | Overtime | Double Time | Overtime | Double Time | DLSE | Walmart | Difference |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) (2)/(3)* [(4)*(6)+(5)*(7)] | (9) | (10) (9)-(8) |
| 2014 Q4 | $ 506.85 | 491.4 | 2.9 | 0.0 | 0.5 | 1.0 | $  1.51 | $  4.19 | $  2.68 |
| 2015 Q1 | 445.98 | 378.0 | 2.6 | 0.0 | 0.5 | 1.0 | 1.52 | 4.41 | 2.89 |
| 2015 Q2 | 287.40 | 278.2 | 2.2 | 0.0 | 0.5 | 1.0 | 1.14 | 3.10 | 1.96 |
| 2015 Q3 | 107.79 | 142.4 | 0.3 | 0.0 | 0.5 | 1.0 | 0.12 | 0.35 | 0.23 |
| 2015 Q4 | 546.48 | 409.4 | 13.2 | 0.0 | 0.5 | 1.0 | 8.78 | 24.20 | 15.42 |
| 2016 Q1 | 333.94 | 452.3 | 6.4 | 0.0 | 0.5 | 1.0 | 2.37 | 6.97 | 4.60 |
| 2016 Q2 | 368.82 | 549.7 | 15.2 | 0.3 | 0.5 | 1.0 | 5.25 | 15.54 | 10.29 |
| 2016 Q3 | 419.74 | 556.2 | 18.3 | 0.1 | 0.5 | 1.0 | 6.97 | 20.75 | 13.78 |

Notes: Weekly hours data for part of 2014 Q3 are not available.

WIN 217914530 terminated prior to the end of 2016 Q4 and thus did not receive a MyShare Bonus payment for 2016 Q4.

Mr. Toney uses 2016 Q1 (the row highlighted in yellow) for WIN 217914530 as his example on page 6 of his May 15, 2020 report.

Sources:  217914530_EarningsHist.xlsx.
DOC000982-984.
DOC000995-997.
DOC001008-1010.
DOC002024-DOC002033.
https://www.dir.ca.gov/dlse/faq_overtime.htm.

# Appendix A

Case 2:17-cv-07641-AB-KK    Document 109-4    Filed 01/24/20    Page 69 of 132    Page ID #:2692

I, Elizabeth Newlon, hereby declare:

## I.    Introduction

## A.    Qualifications

1.    My name is Elizabeth Newlon.  I am an Associate Director at NERA, an international firm of economists founded in 1961 with more than 400 professionals in over 20 offices across North America, Europe, and Asia.  I am an economist specializing in econometrics, labor economics, and competition economics.  I have provided economic consulting services and testimony in a number of matters related to allegations of wage and hour violations.

2.    I received a Ph.D. (and an M.S.) in Economics from Carnegie Mellon University in 2001.  Prior to joining NERA in 2006, I worked as an economic expert for Navigant Consulting and prior to that, Welch Consulting.  Before becoming an economic consultant, I was an Assistant Professor of Economics at the University of Kentucky, where I taught courses in applied microeconomics and general equilibrium theory.  For over 15 years, I have provided consulting and expert testimony on a variety of issues such as competition analysis, class certification, liability, damages, and other economic matters.  A copy of my current curriculum vitae is attached to this declaration as **Exhibit 1**.  NERA is being compensated for my time at a rate of $550 per hour.  Neither NERA's compensation nor my own depends on the outcome of this litigation.

## B.    Assignment

3.    I was asked by Counsel for the Defendant, Wal-Mart Stores, Inc. ("Walmart"), to review the December 16, 2019 declaration of Mr. James Toney[1] and opine about the reliability of Mr. Toney's proposed calculation of classwide damages and Mr. Toney's request for additional data.  As Mr. Toney did not calculate damages for Plaintiff or either of the certified classes in the Evans matter and did not provide a complete theory or methodology for calculating classwide damages, I reserve the right to

---

[1] Declaration of James Toney, December 16, 2019 ("Toney December").  I have also reviewed Mr. Toney's prior declaration filed on October 1, 2019 ("Toney October").

D 061

Case 2:17-cv-07641-AB-KK    Document 109-4    Filed 01/24/20    Page 70 of 132    Page ID #:2693

supplement my opinion in response to any supplemental filings produced by Mr. Toney or any additional expert reports produced by Plaintiff.[2]

## C.    Materials Considered

4.    In preparing this declaration, I, and economists working under my direction, have reviewed documents, data, and declarations produced in this matter by the Plaintiff and Defendant.  The opinions expressed in this declaration are based on my review of this information as well as my training and experience as an economist.  A list of the information sources and materials I considered in forming my opinions is presented in **Exhibit 2**.

## D.    Summary of Opinions

5.    Based on my analysis to date, I have reached the following opinions:

- In cases addressing classwide claims, once class certification has been determined by the court it is necessary for Plaintiff's economic expert to opine about class members' damages and sometimes the merits of Plaintiff's claims.  However, Plaintiff's expert, Mr. Toney, has not provided evidence for Plaintiff's theory about the Regular Rate Class's allegedly incorrect overtime payments or estimated damages for even some of the class members in either certified class.  Instead, I find that Mr. Toney focuses on describing in abstract the data and methods for his future damages analysis.

- Moreover, the information that Mr. Toney requested was produced by Walmart for the Named Plaintiff, James Evans ("Mr. Evans"), and the earnings histories for 1,000 Walmart associates.  In particular, he has the information he says is needed to perform his proposed regular rate damages calculation for Mr. Evans and class members within the 1,000-associate data.  Despite having this information, Mr. Toney did not calculate damages for anyone.  Mr. Toney also does not demonstrate that Walmart did not use the steps he describes in his declaration for calculating overtime payments related to the MyShare Quarterly Incentive Bonus ("Incentive Bonus").  Nor

---

[2] I take no position on the legal issues in this matter.

D 062

does he show that Walmart's Incentive Bonus overtime payments violated California Labor Law.

- When describing his procedure for determining when a wage statement penalty would be owed to class members, Mr. Toney does not consider whether the class members did receive paper wage statements, nor does he consider whether there are class members who believe that they were "provided with an accurate itemized statement in writing" with either the electronic version or the ability to print their wage statement. Instead, Mr. Toney simply assumes that all class members received the same choices and have the same preferences for the form of their wage statement.

6.    These opinions and the following analysis are based on my review of the documents and information made available to me to date. As noted, I reserve the right to update my opinions should additional information be provided to me. I also reserve the right to respond to any data analysis set forth by the Plaintiff, if such an analysis is conducted, once it has been provided to me.

## II.    Despite Having Access to Relevant Information, Mr. Toney Produced Only a Description of Possible Future Analyses Instead of Damages Estimates and Evidence in Support of Plaintiff's Theories

7.    Mr. Toney was asked by Plaintiff's counsel to produce a "discussion" of the data he determined to be necessary to address "the issues in this matter."[3] Mr. Toney then describes the relevant "issues" in the Evans matter to be "Regular Rate computation and the related rate utilized in the payment of premium hours worked, Paystub Penalties due to under payment of wages when premium hours are worked during the bonus period, and the inability of employees to obtain paper copies of their paystub."[4]

8.    Mr. Toney's brief characterization of the status of the Evans matter neglects the most significant information related to Plaintiff's classwide claims for

---

[3] Toney December, p. 1.

[4] Toney December, p. 1.

3

D 063

damages. Judge Andre Birotte Jr. has certified *two classes* of Walmart associates:[5]

- The Regular Rate Class – "All persons employed as hourly-paid employees by Defendant in any store in California at any time on or after September 13, 2013 through the date of class certification who were paid overtime and non-discretionary bonus in any pay period."[6]

- The Wage Statement Class – "All persons employed as hourly-paid employees by Defendant in any store in California at any time during the period beginning one year before the filing of this action and ending when final judgment is entered."[7]

9. Once classes have been certified, it is necessary for Plaintiff's expert to opine about the damages related to (and sometimes the merits of) Plaintiff's claims. Moreover, the calculation of damages must flow directly from Plaintiff's theory of classwide injury. As I will show, in his December 2019 filing, Plaintiff's expert does not provide evidence for Plaintiff's theory about the overtime payments to the Regular Rate Class or estimate damages for the Plaintiff or any class member. Instead, Mr. Toney only describes the data and methodologies he *will* use, presumably at a future date, to calculate damages.

## A.    Mr. Toney Has the Type of Data He Requested for Calculating Damages

10. In Section 4 of his December 2019 declaration, Mr. Toney lists the data and documents that he has reviewed.[8] First, Mr. Toney lists two files containing payroll data for Plaintiff Evans—the first file contains PDFs of his original paystubs and the second file presents his compensation and hours by pay period and pay type in a machine-readable format.[9] Mr. Toney also

---

[5] Order Granting Motion to Stay Proceedings with Respect to Count VI and Granting In Part and Denying in Part Plaintiffs' Motion for Class Certification, filed November 25, 2019 ("Class Cert Order"), pp. 15, 21, and 22.

[6] Class Cert Order, p. 2.

[7] Class Cert Order, pp. 2-3.

[8] Toney December, p. 3, Section 4.

[9] PDFs of Mr. Evans's paystubs, DOC000822-DOC000927. The machine-readable format is the Excel file of Mr. Evans's compensation and hours by pay period, DOC000815. [See, https://opendatahandbook.org/glossary/en/terms/machine-readable/.] The Excel file has two tabs, the first contains payroll records of Mr. Evans's earnings history for hours worked ("Earnings_History") and the second tab contains the DOE history for other payments related to Mr. Evans's earnings ("DOE_History").

4

Case 2:17-cv-07641-AB-KK    Document 109-4    Filed 01/24/20    Page 73 of 132    Page ID #:2696

reviewed internal Walmart documents describing the structure of the Incentive Bonus for fiscal years 2014 through 2016.[10]  Although the documentation for the fiscal year 2017 Incentive Bonus was produced, it is unclear why Mr. Toney did not review that document.[11]

11.  Mr. Toney also refers to the production of data on the "pay records" of 1,000 associates but does not cover this information in his list of documents reviewed.[12]  Therefore, I assume that Mr. Toney did not review the 1,000 associates' payroll data.  It is my understanding that Plaintiff received this data on September 30, 2019.[13]

12.  After presenting the information that he reviewed, Mr. Toney describes his data requirements "for the calculation of unpaid wages related to the improper rate utilized when calculating premium hour payments."[14]  Mr. Toney requests the follow information:

- The Start and End Dates for the Incentive Bonus Periods[15]

  The Walmart documents describing the structure of the Incentive Bonus for each fiscal year contain this information for fiscal years 2014 through 2017.[16]  Mr. Toney says that he reviewed these documents for fiscal years 2014 through 2016.[17]  Each Incentive Bonus document has the dates for the "Company's quarters that are used to determine average weekly hours" for the Incentive Bonus calculation in each quarter of the fiscal year.[18]  **Exhibit 3** shows the start and end dates by fiscal year and incentive quarter contained in these documents.

---

[10] FY2014, DOC000980-DOC000992. FY2015, DOC000993-DOC001005. FY2016, DOC001006-DOC001020.

[11] DOC000001-DOC000015.

[12] Toney December, pp. 1 and 4.

[13] Communication with Counsel.

[14] Toney December, p. 4, Section 5.

[15] "The period for which the incentive was based or calculated.  The start and end date for the incentive period." [Toney December, p. 4, Section 5, a.]

[16] FY2014, DOC000980-DOC000992; FY2015, DOC000993-DOC001005; FY2016, DOC001006-DOC001020; FY 2017, DOC000001-DOC000015.

[17] Toney December, p. 3, Section 4, c.-e.

[18] See, for example, DOC000980-DOC000992.

**Exhibit 3**
**Start and End Dates by Fiscal and Incentive Quarter, 2014-2017**

| Quarter | Fiscal Quarter | | Incentive Quarter | | Source |
| | Start Date | End Date | Start Date | End Date | |
|---|---|---|---|---|---|
| Q1 2014 | 2/1/2013 | 4/30/2013 | 1/26/2013 | 4/19/2013 | DOC000982 |
| Q2 2014 | 5/1/2013 | 7/31/2013 | 4/20/2013 | 7/26/2013 | DOC000982 |
| Q3 2014 | 8/1/2013 | 10/31/2013 | 7/27/2013 | 10/18/2013 | DOC000982 |
| Q4 2014 | 11/1/2013 | 1/31/2014 | 10/19/2013 | 1/24/2014 | DOC000982 |
| Q1 2015 | 2/1/2014 | 4/30/2014 | 1/25/2014 | 4/18/2014 | DOC000995 |
| Q2 2015 | 5/1/2014 | 7/31/2014 | 4/19/2014 | 7/25/2014 | DOC000995 |
| Q3 2015 | 8/1/2014 | 10/31/2014 | 7/26/2014 | 10/31/2014 | DOC000995 |
| Q4 2015 | 11/1/2014 | 1/31/2015 | 11/1/2014 | 1/23/2015 | DOC000995 |
| Q1 2016 | 2/1/2015 | 4/30/2015 | 1/24/2015 | 4/17/2015 | DOC001008 |
| Q2 2016 | 5/1/2015 | 7/31/2015 | 4/18/2015 | 7/24/2015 | DOC001008 |
| Q3 2016 | 8/1/2015 | 10/31/2015 | 7/25/2015 | 10/30/2015 | DOC001008 |
| Q4 2016 | 11/1/2015 | 1/31/2016 | 10/31/2015 | 1/22/2016 | DOC001008 |
| Q1 2017 | 2/1/2016 | 4/30/2016 | 1/23/2016 | 4/29/2016 | DOC000003 |
| Q2 2017 | 5/1/2016 | 7/31/2016 | 4/30/2016 | 7/22/2016 | DOC000003 |
| Q3 2017 | 8/1/2016 | 10/31/2016 | 7/23/2016 | 10/28/2016 | DOC000003 |
| Q4 2017 | 11/1/2016 | 1/31/2017 | 10/29/2016 | 1/20/2017 | DOC000003 |

It is clear from his October 2019 declaration that Mr. Toney knows how to find the start and end dates for the period of time over which the Incentive Bonus was calculated. In his October 2019 declaration, Mr. Toney performs an analysis of Mr. Evans's Incentive Bonus overtime payment for the fourth quarter of fiscal year 2016.[19] "Based on DOC001006-DOC001020," the Walmart document containing Incentive Bonus information for fiscal year 2016, the fourth quarter incentive period goes from "10/31/15 – 1/22/16."[20] Mr. Toney then lists the hours worked in each pay period within the fourth quarter incentive period.[21] Therefore, before submitting his report on October 1, 2019, Mr. Toney understood that the Incentive Bonus documents contained the dates for each incentive period and had the confidence in that knowledge to perform an analysis of the Incentive Bonus overtime payment for a specific quarter. In his December 2019

---

[19] Toney October, p. 5, Section 7.

[20] Toney October, p. 5, Section 7.

[21] Toney October, p. 5, Section 7, a.-f.

**D 066**

declaration, Mr. Toney does not explain why he now believes that he does not have information about or cannot determine the dates for incentive periods from the documents received.

- Incentive Bonus Payments and Date of Payment[22]

Mr. Toney received information on each of Mr. Evans's Incentive Bonus payments as well as the payments received by the 1,000 associates. The Incentive Bonus payments are found in the payroll data under the code "MYSHARE INCT."[23] The date in the electronic payroll data associated with each payment is the "Payroll Run Date," which is generally the Sunday following the close of the pay period.[24]

**Exhibit 4** presents the Incentive Bonus information for Mr. Evans by quarter.

---

[22] "The incentive paid to each employee for each period an incentive was earned." "The pay date for each incentive period payment for each employee." [Toney December, p. 4, Section 5, b. and d.]

[23] DOC000815, in Excel tab "DOE_History."

[24] DOC000815. The relevant pay period can be confirmed by comparing the payroll run date of payments to the pay period listed in the paystub PDFs [DOC000822-DOC000927].

7

**D 067**

**Exhibit 4**

**Start and End Dates and Mr. Evans's MyShare Incentive and Overtime Adjustment Payments by Incentive Quarter, 2014-2017**

| Quarter | Incentive Quarter[25] | | MyShare Incentive | | Overtime Adjustment | |
|---|---|---|---|---|---|---|
| | Start Date | End Date | Payroll Date | Amount | Payroll Date | Amount |
| Q1 2014 | 1/26/2013 | 4/19/2013 | n/a | $ n/a | n/a | $ n/a |
| Q2 2014 | 4/20/2013 | 7/26/2013 | n/a | n/a | n/a | n/a |
| Q3 2014 | 7/27/2013 | 10/18/2013 | 12/1/2013 | 128.12 | n/a | n/a |
| Q4 2014 | 10/19/2013 | 1/24/2014 | 3/9/2014 | 151.41 | 3/9/2014 | 0.11 |
| Q1 2015 | 1/25/2014 | 4/18/2014 | 6/1/2014 | 265.29 | 6/1/2014 | 5.41 |
| Q2 2015 | 4/19/2014 | 7/25/2014 | n/a | n/a | n/a | n/a |
| Q3 2015 | 7/26/2014 | 10/31/2014 | n/a | n/a | n/a | n/a |
| Q4 2015 | 11/1/2014 | 1/23/2015 | 3/8/2015 | 309.32 | 3/8/2015 | 2.16 |
| Q1 2016 | 1/24/2015 | 4/17/2015 | 5/31/2015 | 203.53 | 5/31/2015 | 0.46 |
| Q2 2016 | 4/18/2015 | 7/24/2015 | 9/6/2015 | 76.04 | 9/6/2015 | 0.19 |
| Q3 2016 | 7/25/2015 | 10/30/2015 | 11/29/2015 | 198.85 | 11/29/2015 | 0.11 |
| Q4 2016 | 10/31/2015 | 1/22/2016 | 3/6/2016 | 368.28 | 3/6/2016 | 0.51 |
| Q1 2017 | 1/23/2016 | 4/29/2016 | 5/29/2016 | 110.25 | 5/29/2016 | 0.56 |
| Q2 2017 | 4/30/2016 | 7/22/2016 | 9/4/2016 | 155.31 | 9/4/2016 | 1.57 |
| Q3 2017 | 7/23/2016 | 10/28/2016 | n/a | n/a | n/a | n/a |
| Q4 2017 | 10/29/2016 | 1/20/2017 | n/a | n/a | n/a | n/a |

In his October 2019 declaration, Mr. Toney shows that he knows the Incentive Bonus payment information is in the payroll data for Mr. Evans. Mr. Toney uses the PDFs of Mr. Evans's paystubs to determine when he received an Incentive Bonus and the date of payment.[26] Again using his Incentive Bonus example, Mr. Toney also shows that he knows how to determine the period when the Incentive Bonus was earned.[27]

---

[25] The incentive quarter start and end dates can be found at the following bates numbers for each fiscal year: FY2014, DOC000982; FY2015, DOC000995; FY2016, DOC001008; FY2017, DOC000003.

[26] "The calculations referenced above will be demonstrated based on the MyShare Quarterly Incentive Plan payment made on the Advice # 369687636 with a deposit date of 03-10-2016. This paystub is on page 78." [Toney October, p. 4 Section 5.] Mr. Toney's citation is incorrect. The paystub is on page 78 of DOC000822-DOC000927. "The earnings include [...] the MYSHARE INCT amount of $368.28 [...]." [Toney October, p. 5, Section 6.]

[27] "Based on DOC001006-DOC001020, page 3 the 'Incentive Quarter' for the period that proceeds the Advice# 369687636 on 3-10-16 was Fourth Quarter: 10/31/15 – 1/22/16." [Toney October, p. 5, Section 7.] Mr. Toney is saying that the MYSHARE INCT amount of $368.28 paid on March 10, 2016 was earned in the fourth incentive quarter of fiscal year 2016, running from October 31, 2015 to January 22, 2016.

D 068

Case 2:17-cv-07641-AB-KK    Document 109-4    Filed 01/24/20    Page 77 of 132    Page ID #:2700

Therefore, Mr. Toney has the information on Mr. Evans's Incentive Bonuses that he claims he needs. Moreover, if Mr. Toney had reviewed the payroll data for the 1,000 associates, he would have seen that, where applicable, this payment information appears there too.

- Hours Worked by Class Member During Incentive Periods[28]

Walmart produced the regular and overtime hours worked by pay period for Mr. Evans and the 1,000 associates.[29] It is also clear that the "incentive period coincides with the payroll cycle," and therefore, as Mr. Toney observes, pay records can be used to determine the total hours worked in each incentive period.[30] Mr. Toney demonstrates that he knows the pay periods align with the incentive period dates. In his October 2019 declaration, Mr. Toney identifies all the pay periods that fall within the fourth incentive quarter in fiscal year 2016 and uses the work hours in each pay period to calculate the alleged unpaid overtime payment related to the Incentive Bonus.[31]

In **Exhibit 5**, I present a subset of the columns in Mr. Evans's raw payroll data that show his hours worked in the last quarter in which Mr. Evans earned an Incentive Bonus.

---

[28] "The hours worked for each employee for each period that an incentive was earned." [Toney December, p. 4, Section 5, c.]

[29] DOC000815; DOC001022-DOC002021.

[30] "The hours worked for each employee for each period that an incentive was earned. If the incentive period coincides with the payroll cycle, pay records can be utilized." [Toney December, p. 4, Section 5, c.] The pay period start and end dates are listed on each PDF paystub for Mr. Evans, showing that the pay periods do indeed coincide with the incentive quarter start and end dates.

[31] Toney October, p. 5, Section 7.

D 069

## Exhibit 5
### Data for James Evans's Hours Worked in Pay Periods Within Incentive Quarter 2, Fiscal Year 2017

| FIRST_NAME | LAST_NAME | PAYROLL_RUN_DATE | REGULAR_HOURS | OVERTIME_HOURS |
|---|---|---|---|---|
| JAMES | EVANS | 2016-05-15 | 60.49 | 0.17 |
| JAMES | EVANS | 2016-05-29 | 77.5 | 1.29 |
| JAMES | EVANS | 2016-06-12 | 65.7 | 0.05 |
| JAMES | EVANS | 2016-06-26 | 73.02 | 0.14 |
| JAMES | EVANS | 2016-07-10 | 64.7 | 0.7 |
| JAMES | EVANS | 2016-07-24 | 63.86 | 0.51 |

The data on work hours for each of Mr. Evans's incentive periods is complete for his employment period. If Mr. Toney had reviewed the payroll data for the 1,000 associates, he would have seen their work hours information too.

13. One item missing from Mr. Toney's list of required information is the actual overtime payment provided by Walmart with each Incentive Bonus. This information was provided by Walmart for Mr. Evans and, where applicable, the 1,000 associates.[32] It is unclear whether Mr. Toney overlooked the Incentive Bonus overtime payments in his request for information or simply did not request the information because it had already been produced.

14. Finally, given that Mr. Toney claims that information produced by Walmart is inadequate, it is worth noting that he reviewed the same set of data and documents for his October 2019 declaration during the class certification briefing.[33] However, Mr. Toney did not request additional data and documents at that time. Instead, he waited to describe the data that he claims are necessary for his analysis of the Regular Rate Class damages until the deadline for Plaintiff's damages analysis. In addition, Mr. Toney does not explicitly describe the data that he will need to calculate damages for the Wage Statement Class. I reserve the right to respond if Mr. Toney describes what he requires for his analysis of the Wage Statement Class.

---

[32] For Mr. Evans, this can be found in DOC000815, in Excel tab "DOE_History." For the 1,000 associates, this can be found in DOC001022- DOC002021. As Mr. Toney observed in his October declaration, Incentive Bonus overtime payments have the pay code "OVERTIME/INCT." [Toney October, p. 5, Section 6, d.]

[33] Toney October, pp. 3-4. Mr. Toney's October 2019 Declaration was produced as an attachment to Plaintiffs' Reply in Support of Motion for Class Certification, October 1, 2019.

**B.    Mr. Toney Could Have Calculated Damages for Plaintiff and Some Class Members but He Did Not**

**1.    For the Regular Rate Class, Mr. Toney Only Provides a Vague Description of a Process for Calculating the Additional Overtime Payment Related to the Incentive Bonus**

15.    In Section 6 of his December 2019 declaration, Mr. Toney describes the process he proposes to use to calculate the overtime payment associated with the Incentive Bonus.[34]  In this section, Mr. Toney presents what he alleges is the correct formula for calculating the additional overtime owed due to the Incentive Bonus.  However, Mr. Toney provides no support for his conclusion that this formula is the correct way to calculate overtime on production bonuses.  Mr. Toney also does not explain why he changed his approach to calculating overtime for the Incentive Bonus from the two methods presented in his October 2019 declaration.[35]

16.    Mr. Toney has the information he claims he needs to perform his proposed steps for calculating the overtime payment for the Incentive Bonuses paid to Mr. Evans and class members within the 1,000 associates.  Reviewing the earnings histories of the 1,000 associates, I found 614 associates received an Incentive Bonus related to a fiscal quarter in which they worked overtime during the Regular Rate class period.[36]  In his first step, Mr. Toney sums the straight time, overtime, and double time worked by incentive period.  The machine-readable payroll data provided by Walmart contains the regular hours and overtime hours worked per pay period.[37]  Mr. Toney also knows the amount and payroll run date of each Incentive Bonus, along with the dates of the incentive quarters.  He also has the amount of the overtime adjustment paid by Walmart for each Incentive Bonus.  With this information, he can perform all three of the steps in his proposed process and could have presented a damage estimate for Mr. Evans and others within the class.

---

[34] Toney December, pp. 4-5, Section 6.

[35] Toney October, p. 4, Section 5.

[36] I determined whether an associate worked overtime during an incentive quarter using the "Earnings_History" tab of the earnings history files. [DOC001022-DOC002021.]

[37] See, Exhibit 5.

11

**D 071**

## 2. For the Wage Statement Class, Mr. Toney Only Provides a Limited Description of His Proposed Damages Calculation

17.     In Section 7 of his December 2019 declaration, Mr. Toney presents a brief and limited description of how he proposes to determine when a wage statement penalty is owed. Wage statement penalties can flow from Plaintiff's overtime payment and wage statement claims. Yet, as Mr. Toney says in the final sentence of the section, there is only one wage statement penalty payment possible per pay period.[38]  However, in his proposed methodology for calculating Wage Statement Class damages, Mr. Toney does not explain how he will address the different potential outcomes of this case.

18.     In addition, Mr. Toney does not present any evidence for the central question whether Walmart's process for furnishing wage statements to Mr. Evans or class members violated California law. Mr. Toney does not consider whether the class members did receive paper wage statements. If there are class members who did receive paper statements, there are class members who were offered the choice of a paper statement. Mr. Toney also does not explain how this fact would affect his calculation of damages for the Wage Statement Class.

19.     Furthermore, Mr. Toney does not offer a methodology for identifying the class members who did not prefer to receive a paper wage statement and, therefore, were not affected by the alleged lack of a paper option. These are the class members who believe that they were "provided with an accurate itemized statement in writing" with either the electronic version or the ability to print their wage statement. Mr. Toney's methodology assumes that all class members have the same preferences for the form of their wage statement. However, it has not been proven by Plaintiff that all or nearly all class members did not receive a choice of an itemized statement in writing simply because they might not have received a paper option. Moreover, Plaintiff and Plaintiff's expert have not demonstrated how the failure to offer an option that an individual would not have considered leads to economic injury.

---

[38] I also understand that Plaintiff's counsel intends to remove class members who received a wage statement penalty as part of the *Magadia v. Wal-Mart*, Case No. 5:17-cv-00062 (N.D. Cal.) decision. Mr. Toney, however, does not address how he intends to remove class members who already received a wage statement penalty.

D 072

Dated January 15, 2020

Elizabeth H. Newlon

13

**Exhibit 1**

# NERA
Economic Consulting

National Economic Research Associates, Inc.
Suite 1950
777 South Figueroa Street
Los Angeles, California 90017
+1 213 346 3000 Fax +1 213 346 3030
Direct dial: +1 213 346 3019
elizabeth.newlon@nera.com
www.nera.com

# ELIZABETH HART NEWLON
## DIRECTOR

Dr. Newlon has extensive expertise applying economics and statistics to matters relating to labor and antitrust litigation. During her 15 years as an economic consultant and testifying expert, she has prepared expert reports, testified, and consulted on matters involving a wide range of topics related to FLSA, state labor law, and antitrust law violations, including allegations of wage suppression. Dr. Newlon has analyzed labor and antitrust claims in individual and class/collective actions (addressing questions at certification, liability, and damages phases). In addition to her knowledge of economic and statistical analyses, she also has experience building large and complex databases from diverse sources to address market-wide economic questions.

In labor litigation, Dr. Newlon has significant experience with contractor misclassification and joint-employer claims. She has performed damages calculations for wage and hour allegations under FLSA and state labor laws, including extensive experience with violations of California labor statutes resulting in unpaid overtime, incorrect regular-rate calculation, missed meal penalties, timesheet rounding bias, and waiting-time and itemization penalties. Dr. Newlon also has significant experience analyzing pay disparities by gender and race for internal audits and litigation. Moreover, Dr. Newlon has assessed economic losses in single-plaintiff matters related to alleged wrongful termination, injury, and incarceration.

At the nexus of labor and antitrust litigation, Dr. Newlon has significant experience evaluating allegations of compensation suppression by employers. She has assisted clients in a range of industries including high tech, childcare, and healthcare. Dr. Newlon has also analyzed antitrust claims related to collusive agreements, price fixing, and foreclosure.

Prior to entering private practice, Dr. Newlon was an Assistant Professor of Economics at the University of Kentucky, where she taught graduate classes in equilibrium theory and undergraduate classes in microeconomics. Her university research focused on the optimal provision of public goods, such as education and policing. Dr. Newlon has published articles on these subjects and has presented her work at various professional economic conferences and special seminars.

MMC Marsh & McLennan Companies

**D 074**

**Exhibit 1**
Dr. Elizabeth Newlon

## Education

**Carnegie Mellon University**
Ph.D., Economics, Tepper School of Business, 2001

**Carnegie Mellon University**
M.S., Economics, Tepper School of Business, 1994

**The Ohio State University**
B.S., Economics, 1993

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| 2018 | Director |
| 2012-2017 | Vice President – Associate Director |
| 2007-2012 | Senior Consultant |
| 2006-2007 | Consultant |

**Navigant Consulting**

| | |
|---|---|
| 2005 | Managing Consultant |

**Welch Consulting**

| | |
|---|---|
| 2003-2005 | Economist |

**University of Kentucky**

| | |
|---|---|
| 2000-2002 | Assistant Professor, Gatton College of Business and Economics |

## Retained as Expert and Expert Testimony

*Clergy Community Coalition v. Premier Health Partners,* U.S. Department of Health and Human Services - Office for Civil Rights, Transaction No. 18-305219.
*Report* submitted on November 10, 2013 for Premier Health addressing Plaintiffs' disparate impact allegations under Title VI and Affordable Care Act.

*Luis Ruano and Leticia Ruano v. Los Angeles Unified School District, et al.*, Superior Court of the State of California, County of Los Angeles, Case No. BC677331.
*Report* submitted for LAUSD addressing Plaintiff's Expert's damages estimates, signed September 10, 2019. *Deposition testimony* on September 13, 2019.

**Exhibit 1**
Dr. Elizabeth Newlon

*Jimmy H. Thomas and Sony Thomas v. Akzo Nobel Coatings, Inc., et al.*, Superior Court of the
State of California, County of Alameda, Case No. RG 17882514.

*Susan Teasley v. Equinor US Holdings, Inc.,* American Arbitration Association, Case No. 01-18-
0002-1427.
*Report* submitted on June 28, 2019 for Equinor US Holdings addressing Plaintiff's
discrimination allegations. *Arbitration testimony* on November 1, 2019.

*Jeffrey Cox v. Roadrunner Intermodal Services, LLC, et al.*, United States District Court for the
Eastern District of California, Case No. 1:17-CV-01207-DAD-BAM.
*Report* submitted on April 12, 2019 for Roadrunner Intermodal Services addressing
Plaintiffs' Expert's damages estimates.

*Cassandra Enochs v. Behavioral Autism Therapies, LLC, et al.*, Superior Court of the State of
California, County of San Bernardino, Case No. 1719939.
*Affidavit* submitted for Behavioral Autism Therapies for mediation on October 31, 2018.

*Consulting expert* on compensation equity audit for high-tech company, August 2018 to present.

*Consulting expert* on compensation equity audit for multinational consulting company, June
2018 to August 2018.

*Chelsea Hamilton, et al. v. Wal-Mart Stores, Inc., et al.*, United States District Court for the
Central District of California, Case No. 5:17-cv-01415 AB (KKx).
*Declaration* submitted for Wal-Mart, Inc. addressing Plaintiffs' and Plaintiffs' Expert's
proposed methodologies to analyze liability and damages, filed on July 13, 2018. *Deposition
testimony* on July 30, 2018. *Declaration* submitted for Wal-Mart, Inc. in rebuttal to
Plaintiffs' Expert's damages declaration on October 22, 2018.

*Juan Garcia v. Wal-Mart Stores, Inc.*, United States District Court for the Central District of
California, Case No. 5:16-CV-01645 TJH (RAOx).
*Declaration* submitted for Wal-Mart, Inc. addressing Plaintiff's Expert's proposed
methodologies to analyze liability and damages, filed on April 16, 2018. *Deposition
testimony* on May 7, 2018. *Reply Declaration* submitted on June 7, 2018. *Rebuttal
declaration* submitted on May 6, 2019 in response to Plaintiff's expert's declaration.
*Deposition testimony* on May 23, 2019.

*Stephanie Cekov v. Pitzer College*, Superior Court of the State of California, County of
Sacramento, Case No. BC682871.
*Consulting expert* for Pitzer College from April 2018 to June 2018.

*Mr. Benjamin Harris v. Vision Service Plan,* Superior Court of the State of California, County of
Sacramento, Case No. 34-2016-00189041.
*Report* submitted for Vision Service Plan addressing Plaintiff's Expert's damages estimates,
signed December 21, 2017. *Deposition testimony* on January 4, 2018.

**Exhibit 1**
Dr. Elizabeth Newlon

*Fluegel, et. al. v. FedEx Corporation, et al.,* United States District Court for the Northern District of Illinois, Case No. 1:05-cv-02326. *Consulting Expert* for FedEx Ground from October 2017 to August 2018.

*Laura Ann DeCrescenzo v. Church of Scientology International, et al.*, Superior Court of the State of California, County of Los Angeles, Case No. BC411018.
*Report* submitted in opposition to Plaintiffs' Expert's report estimating Plaintiff's alleged lost wages, August 8, 2017.

*Consulting expert* for FedEx Ground Package Systems on wage and hour matter in the United States District Court for the District of New Jersey from August 2017 to present.

*Consulting expert* for FedEx Ground Package Systems on wage and hour matter in the United States District Court for the District of New Mexico from August 2017 to present.

*Johana Paola Beltran, et al. v. InterExchange, Inc., et al.*, United States District Court for the District of Colorado, Case No. 14-cv-03074-CMA-KMT.
*Report* submitted in opposition to certification of the labor class and collective actions, signed January 13, 2017. Class and collective actions rebuttal *report* submitted, signed February 3, 2017. *Deposition testimony* on April 12, 2017. Merits and damages *report* submitted, signed July 31, 2017. Merits and damages rebuttal *report* submitted, signed October 30, 2017. *Deposition testimony* on March 9, 2018.

*Eillen Voellinger v. Sumo Logic*, Superior Court of the State of California, County of San Mateo, Case No. 16CIV00371.
*Declaration* submitted in opposition to Plaintiffs' Motion to Quash Defendant's Subpoena for Records, signed January 17, 2017.

*Nikmanesh, et al. v. Wal-Mart Stores, Inc., et al.*, United States District Court for the Central District of California, Southern Division, Case No. 8:15-CV-00202-AG-JCG.
*Declaration* submitted in opposition to Plaintiffs' Expert's proposed use of timekeeping and alarm data, signed November 7, 2016. *Report* served to Plaintiffs on April 24, 2017.

*Consulting expert* for FedEx Ground Package Systems on wage and hour matter in New York State Court from April 2016 to present.

*Consulting expert* for FedEx Ground Package Systems on wage and hour matter in the United States District Court for the Western District of New York from April 2016 to present.

*Clyde E. Woomer, et al. v. FedEx Ground Package System, Inc.*, Court of Common Pleas of Allegheny County, Pennsylvania, No. GD 05-020678.
*Consulting Expert* for FedEx Ground from January 2016 to October 2018.

*Woomer vs. Fedex Ground Package System Inc.*, Court of Common Pleas of Allegheny County, Pennsylvania, No. GD-05-020678.
*Consulting Expert* for FedEx Ground from December 2015 to May 2017.

**D 077**

**Exhibit 1**
Dr. Elizabeth Newlon

*Consulting Expert* for numerous cases in the MDL, In re FedEx Ground Package System, Inc., *Employment Practices Litigation*, Case No. 3:05-md-527-RM, (MDL-1700), in the United States District Court for the Northern District of Indiana:

*Dean Alexander, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00528-RLM-CAN (**CA**), from November 2014 to June 2015.

*Lawrence Asbury, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:06-cv-00826-RLM-CAN (**WV**), from August 2015 to June 2016.

*Ryan Boudreaux, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00193-RLM-CAN (**LA**), from August 2015 to June 2016.

*Donald E. Carlson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00664-RLM-CAN (**FL**), from February 2015 to November 2015.

*Gregory Cooke, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00668-RLM-CAN (**SC**), from August 2015 to June 2016.

*Daniel Fishler, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00053-RLM-CAN (**UT**), from August 2015 to June 2016.

*Tina Floyd v. FedEx Ground Package System, Inc.*, Civil No. 3:06-cv-00428-RLM-CAN (**AL**), from August 2015 to June 2016.

*Margaret Gibson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00272-RLM-CAN (**AZ**), from August 2015 to June 2016.

*John Humphreys, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00540-RLM-CAN (**TX**), from August 2015 to June 2016.

*Paul Kelly, et al. v. FedEx Ground Package System, Inc.*, Civil No. 5:08-cv-01225-RLM-CAN (**OH**), from August 2015 to June 2016.

*Gary Lee Larson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00601-RLM-CAN (**WI**), from August 2015 to June 2016.

*Katrina Lee, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00533-RLM-CAN (**MN**), from August 2015 to June 2016.

*Larry Louzau, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00538-RLM-CAN (**NY**), from August 2015 to June 2016.

*Roger Riewe, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00390-RLM-CAN (**IN**), from August 2015 to June 2016.

*Edward Slayman, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00596-RLM-CAN (**OR**), from November 2014 to September 2015.

**Exhibit 1**
Dr. Elizabeth Newlon

In combination with the follow-on cases:

*Jon Leighter, et al. v. FedEx Ground Package System, Inc.*, Case No. 3:07-cv-00818-KI

*Christopher Cordova, et al. v. FedEx Ground Package System, Inc.*, Case No. 3:14-cv-01663

*Arthur Smith, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00600-RLM-CAN (**TN**), from August 2015 to June 2016.

*Raymond Tierney, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00599-RLM-CAN (**RI**), from August 2015 to June 2016.

*Michael Tofaute, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00595-RLM-CAN (**NJ**), from August 2015 to June 2016.

*Thomas Westcott v. FedEx Ground Package System, Inc.*, Civil No. 3:06-cv-00485-RLM-CAN (**MD**), from August 2015 to June 2016.

*Earnest White, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00411-RLM-CAN (**GA**), from August 2015 to June 2016.

*Sharon B. Whiteside, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00326-RLM-CAN (**NC**), from August 2015 to June 2016.

*Derek D. Willis v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00597-RLM-CAN (**PA**), from August 2015 to June 2016.

*Sheldrick McNeal, Sr. v. Nucor Steel Tuscaloosa, Inc.*, United States District Court for the Northern District of Alabama, Western Division, Civil Action No. 7:15-cv-01305-LSC. *Consulting Expert* in single plaintiff discrimination case, from April 2016 to June 2016.

*Deanna Matthews v. Sutter West Bay Hospitals, Inc.,* Superior Court of the State of California, County of Marin, Case No. CIV1303547.
Retained as *Testifying Expert* in single plaintiff wrongful termination case, February 2016.

*David Daniels v. Sutter West Bay Hospitals, Inc.,* Superior Court of the State of California, County of Marin, Case No. CIV1304891.
Retained as *Testifying Expert* in single plaintiff wrongful termination case, October 2015.

*Greggory R. Devore, M.D., a Medical Corporation v. Heritage Provider Network, Inc., et al.,* Superior Court of the State of California, County of Los Angeles, Case No. BC484067. *Consulting Expert* for antitrust case related to damages from termination of physician's contract, from October 2014 to August 2015.

**Exhibit 1**
Dr. Elizabeth Newlon

*Monet Alvarez v. M.A.C Cosmetics Inc.*, Superior Court of the State of California, County of Orange, Case No. 30-2014-00750745.
 *Consulting Expert* in class-action wage and hour matter related to allegations of unpaid work filed under PAGA, June 2015.

*Michele Castillo v. M.A.C Cosmetics Inc.*, Superior Court of the State of California, County of Marin, Case No. CIV1402791.
 *Consulting Expert* in class-action wage and hour matter related to allegations of unpaid final wages, June 2015.

*Tina Hamilton, et al. v. NHS Management, L.L.C., et al.*, United States District Court for the Western District of Missouri, Southwestern Division, Case No. 3:12-cv-05044-JTM.
 *Declaration* submitted in support of Defense's motion for decertification, signed November 4, 2014.

*Jerome Davis v. Brown Shoe Company*, United States District Court for the Eastern District of California, Fresno Division, Case No. 1:13-cv-01211-LJO-BAM.
 *Declaration* submitted in opposition to Plaintiff's Statement Re: Discovery Disagreement, signed September 4, 2014.

*Sean Burke v. Broker Solutions, Inc., et al.*, Superior Court of the State of California, County of Orange, Case No. 30-2014-00722233-CU-OE-CXC.
 *Consulting Expert* in class-action wage and hour matter related to alleged errors in calculating regular rate, from August 2014 to May 2015.

*Aaron Eubanks v. Wilshire Associates Incorporated,* Superior Court of the State of California, County of Los Angeles, Case No. BC 483580, ADRS Case No. 13-0178-PLC.
 *Expert Report* and *Testimony* at arbitration on February 28, 2014 relating to damages arising from alleged wrongful termination.

*John Kellenbenz v. Seton Medical Center*, Superior Court of the State of California, County of San Mateo, Case No. CIV 514600.
 *Consulting Expert* in class-action wage and hour matter related to allegations of failure to pay for all hours worked and unpaid final wages, from February 2013 to July 2013.

*Maral Hintiryan, et al. v. Condusiv Technologies Corporation,* Superior Court of the State of California, County of Los Angeles, Case No. BC 424 359.
 *Consulting Expert* in class-action wage and hour matter related to allegations of incorrect overtime and double-time payments, pay statement itemization, and waiting-time penalties, from June 2012 to September 2012.

*Sue A. Leeder v. Secretary of Defense, Leon Panetta,* United States District Court for the Northern District of California, San Jose Division, Case No. C 10-01822-HRL.
 *Expert Report* submitted on May 15, 2012 relating to damages arising from alleged wrongful termination.

**D 080**

**Exhibit 1**
Dr. Elizabeth Newlon

*Robert A. & Pearl Fletcher v. Commissioner of Internal Revenue; Thousand Oaks Residential Care Home v. Commissioner of Internal Revenue; and Thousand Oaks Residential Home, Inc. v. Commissioner of Internal Revenue,* Federal Tax Court, Docket Nos. 1481-10, 1448-10, and 1480-10.
*Expert Report* and *Trial Testimony* on December 16, 2011 about reasonable compensation for owners of a residential care facility in Southern California.

*Woodson & Rummerfield's House of Design, Inc. v. Lisa Beaulieu (A/K/A Lisa Marie Presley),* before the American Arbitration Association, Western Case Management Center, AAA Case No. 72 529 Y 00894 09 JISI.
*Deposition testimony* on January 19, 2011 about damages incurred by Defendant in relation to dispute about design services provided by Plaintiffs.

*Moshe Marciano, et al. v. Ameriflight, LLC, et al.,* Superior Court of the State of California, County of Los Angeles, Case No. EC045694.
Expert opinion prepared regarding damages for wrongful injury claim prepared for Ameriflight.

*Report* "Assessing the Property Value Impact of Mississippi Cottages," written pro-bono for Mississippi Center for Justice, dated October 10, 2010.

## Experience Working for Other Experts

### *Labor and Wage Suppression Cases:*

» Analysis of class damages and preparation of report in case alleging compensation suppression by seven major tech firms in Silicon Valley.

» Analysis of economic losses due to alleged wrongful termination of five women in financial management positions by a major investment bank.

» Recommendations on a compensation model for clinic medical directors' pay on Part 494 hours worked for a national chain of dialysis clinics.

» Analysis of regular rate calculations for the purpose of assessing overtime and missed meal penalty payments to nurses at a major hospital in Southern California.

» Analysis of economic losses due to alleged wrongful termination by Verizon Wireless, Inc.

» Analysis of compensation and promotion practices of a major aero-space company with respect to claims of gender discrimination in compensation and promotion.

» Audit of differences in compensation by gender and race for group of financial and business consulting companies.

» Survey analysis for matter involving claim of misclassification of independent contractors by IRS against a California city.

» Estimated damages in a wrongful termination action against a California software company.

**D 081**

**Exhibit 1**
Dr. Elizabeth Newlon

» In a collective action against a technology company, analyzed allegation that older workers were more likely to be discharged through reductions in force.

» Estimated damages in a wrongful imprisonment action against City police in Massachusetts.

» Analysis of economic losses due to alleged wrongful termination by Diagnostic Products Corporation.

*Antitrust and Intellectual Property Cases:*

» Modeling of Arizona dentists' incentives to join competing carriers' networks and analysis of NetMinder provider network affiliation data.

» Analysis of foreclosure claims by Orthopedic Spine Surgeon against Hospital in Santa Barbara and competing Neurosurgeons.

» Analysis of antitrust liability associated with claims of foreclosure and tying in a case relating to physician privileges at a general acute care hospital in California.

» Analysis of class action nursing monopsony claims against a major hospital association relating to the wage effect of a price ceiling on bill rates for nursing services.

» Valuation of future royalties of a pharmaceutical product for an intellectual property case.

» Valuation of future royalties of a prosthetic device for an intellectual property case.

» Analysis of claims data for major multi-district litigation related to out-of-network reimbursement of provider claims.

» Analysis of antitrust issues in a case relating to revenue sharing agreements in the retail grocery market, involving analysis of large sales databases and multiple reports.

» Foreclosure and exclusionary bundling case against a large medical manufacturer, related to GPO contracting.

## Presentations

» "No-Poach" Agreement Enforcement: Hot-Buttons in 2020 and Beyond." Knowledge Group Webinar on December 10, 2019.

» "Preliminary Analysis, CAST Data - Labor Trafficked Clients." Presentation to Los Angeles County Department of Public Health on July 15, 2019.

» "How to Effectively Use Expert Evidence in Wage and Hour Litigation: A Comprehensive Guide for 2019." Knowledge Group Webinar on April 25, 2019.

» "Calculating Damages and Modeling Exposure – Covering All the Bases." Presentation at FedEx Ground, Moon Township, PA on March 29, 2019.

**D 082**

**Exhibit 1**
Dr. Elizabeth Newlon

» "Preliminary Analysis, CAST Data - Labor Trafficked Clients." Presentation to LA Regional Human Trafficking Task Force's Labor Trafficking Subcommittee on February 14, 2019.

» "Wage and Hour Class Actions: Looking Back and What's Ahead." Knowledge Group Webinar on January 17, 2019.

» "Wage and Overtime Law in the 2018 Landscape: Updates and Developments You Need to Know." Knowledge Group Webinar on August 29, 2018.

» "Blurring the Bright Line of Statistical Significance - The High-Tech Employees Antitrust Litigation." NERA's 36th Antitrust and Trade Regulation Seminar on July 7, 2017.

» "Practical Strategies and Latest Legal Developments in Wage & Hour Litigation and Compliance." Knowledge Group Webinar on June 28, 2017.

» "The EEOC's Proposed Revisions to the EEO-1 Report: Time to Overhaul Your Payroll System?" Knowledge Group Webinar on September 19, 2016.

» "Class Certification in Wage and Hour Cases: How Statistics Can Help." Presentation given at Drinker Biddle and Reath in Century City, CA on May 21, 2014.

» "Post-*Dukes* Developments in Employment Class Actions and the Role of the Economist." Presentation with Betsy Becker and Flavia Bainbridge given at Paul Hastings in Los Angeles, CA on May 7, 2013.

» "Calculating Damages in Wrongful Termination Cases:  Reality Matters." Presentation with Kristin Terris given at Mitchell Silberberg & Knupp, LLP in Los Angeles, CA on January 18, 2012.

» "What's in an Average?  How to Recognize Misleading Statistics in Employment Cases." Presentation with Betsy Becker given at Jackson Lewis LLP in San Francisco, CA on December 16, 2010.

» "One Size Doesn't Fit All:  Calculating Damages in Wrongful Termination Cases." Presentation given at Hill Farrer & Burrill LLP in Los Angeles, CA on January 21, 2010.

» "What's in an Average?  How to Recognize Misleading Statistics in Employment Cases." Presentation with Stephanie Plancich given at O'Melveny & Myers LLP in Los Angeles, CA on August 11, 2009.

» "What's in an Average?  How to Recognize Misleading Statistics in Employment Cases." Presentation with Kristin Terris and John Johnson given at NERA's CLE Labor Luncheon in Los Angeles, CA on October 23, 2008.

» The Public Choice Society, 2001, 1997, and 1996.

» Harvard University, December 2000.

» MacArthur Group on Poverty and Inequality, March 2000.

**Exhibit 1**
Dr. Elizabeth Newlon

» Stanford Institute for Theoretical Economics (SITE), seminars on Competition in Urban Economics, July 1998.

» The National Tax Association, 1997.

## Publications

» "Life After Tyson: A New Demand for Expert Counterstudies," with Sarah Butler and Bryan Tomlin, *Law360*, March 29, 2016.

» "Top Five Things You Should Know about the EEOC's Proposed Changes to the Employer Information Report," Online Legal Blog, Suits by Suits, presented by Zuckerman Spaeder LLP, March 25, 2016.

» "Revenue Sharing Agreements: Do They Restrict Competition?," with Kristin Terris and Thomas McCarthy, *ABA Antitrust Law, Economics Committee Newsletter*, Vol. 10, No. 1, Summer 2010.

» "Implications of the Fair Pay Act for Statistical Analysis in Wage Discrimination Suits," with Chris Erath and Denise Martin, March 2009.

» "Ability Tracking, School Competition, and the Distribution of Economic Benefits," with Dennis Epple and Richard Romano, *Journal of Public Economics*, January 2002.

» "The Effects of Educational Vouchers when Schools Track Students by Ability," with Dennis Epple and Richard Romano, *Environmental and Public Economics: Essays in Honor of Wallace E. Oates* (Arvind Panagariya, Paul R. Portney, and Robert M. Schwab, eds.), Edward Elgar Publishing, 1999.

January 2020

**Exhibit 2**

## Materials Considered by Elizabeth Newlon

**Court Filings**

*James S. Evans and Keineisha Smith, on behalf of themselves, all others similarly situated, Plaintiffs, vs. Wal-Mart Stores, Inc., a Delaware corporation; and DOEs 1 through 50, inclusive, Defendants. United States District Court, Central District of California, Case No. 2:17-cv-7641-RGK-GJS:*

Order Granting Motion to Stay Proceedings with Respect to Count VI and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, November 25, 2019

Joint Stipulation to Dismiss Without Prejudice Plaintiff Keineisha Smith Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), November 14, 2019

Plaintiffs' Reply in Support of Motion for Class Certification, October 1, 2019

Plaintiffs' Request for Judicial Notice in Support of Reply in Support of Motion for Class Certification Filed Conditionally Under Seal, October 1, 2019

Notice of Errata Regarding Defendant Walmart's Brief in Opposition to Plaintiffs' Motion for Class Certification, September 25, 2019

Appendix of Evidence in Support of Walmart's Appendix of Evidence Submitted in Support of Its Opposition to Plaintiffs' Motion for Class Certification, September 3, 2019

Defendant Walmart's Brief in Opposition to Plaintiffs' Motion for Class Certification, September 3, 2019

Notice of Errata and Correction to Plaintiffs' Notice of Motion and Motion for Class Certification [Redacted] Filed Conditionally Under Seal, July 24, 2019

Plaintiffs' Amended Notice of Motion for Class Certification [Redacted] Filed Conditionally Under Seal, July 23, 2019

Plaintiffs' Application for Leave to File Under Seal Portions of Its Motion for Class Certification and Designated Exhibits Attached to the Declaration of William M. Pao, July 22, 2019

Plaintiffs' Notice of Motion and Motion for Class Certification [Redacted] Filed Conditionally Under Seal, July 22, 2019

[Proposed] Order Granting Class Certification, filed July 22, 2019

Wal-Mart Stores, Inc.'s Answer to Plaintiff's First Amended Complaint, January 8, 2018

First Amended Complaint, November 13, 2017

**D 085**

**Exhibit 2**

**Declarations**

Declaration of James Evans, July 22, 2019

Declaration of Robert J. Herrington in Support of Walmart's Opposition to Plaintiffs' Motion for Class Certification, September 3, 2019

Declaration of Diana McChristian in Support of Defendant Walmart Inc.'s Opposition to Plaintiffs' Motion for Class Certification, August 29, 2019

Declaration of William M. Pao in Support of Plaintiff's Reply in Support of Motion for Class Certification [Redacted] Filed Conditionally Under Seal, October 1, 2019 and accompanying exhibits

Declaration of William M. Pao in Support of Plaintiff's Motion for Class Certification [Unredacted] Filed Conditionally Under Seal, July 22, 2019 and accompanying exhibits

Declaration of Shaun Setarch in Support of Plaintiff's Motion for Class Certification Filed Conditionally Under Seal, July 22, 2019

Declaration of James Toney, December 16, 2019

Declaration of James Toney, October 1, 2019

**Depositions**

Deposition of James Evans, August 19, 2019 and accompanying exhibits

**Bates Stamped Documents**

DOC000001-DOC000015

DOC000814

DOC000815

DOC000816

DOC000817

DOC000818

DOC000819-DOC000821

**D 086**

**Exhibit 2**

DOC000822-DOC000927

DOC000980-DOC000992

DOC000993-DOC001005

DOC001006-DOC001020

DOC001021-DOC002021


**Publicly Available Information**

State of California, Department of Industrial Relations, Labor Commissioner's Office, Overtime.
https://www.dir.ca.gov/dlse/faq_overtime.htm. Accessed January 14, 2020.

Open Data Handbook, Glossary, Machine Readable.
https://opendatahandbook.org/glossary/en/terms/machine-readable/. Accessed January 14, 2020.

1

**PROOF OF SERVICE**

2

*Evans v. Wal-Mart - (Case No. 2:17-cv-07641–AB-KK)*

3

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

4

     I am employed in the aforesaid county, State of California; I am over the age of 18

5

years and not a party to the within action; my business address is **1840 Century Park East, Suite 1900, Los Angeles, CA 90067,** *gutierrezd@gtlaw.com.*

6

7

     On the date given below, I served the **DEFENDANT'S SECOND REBUTTAL EXPERT WITNESS DISCLOSURE** on the interested parties in this action by placing

8

the true copy thereof, enclosed in a sealed envelope addressed as follows:

9

10

Shaun Setareh, Esq.
William M. Pao, Esq.

11

SETAREH LAW GROUP
315 S. Beverly Drive, Suite 315

12

Beverly Hills, CA 90212
Telephone: 310-888-7771

13

Facsimile: 310-888-0109

14

shaun@setarehlaw.com;

15

william@setarehlaw.com

16

*Attorneys for Plaintiff James S. Evans*

17

18

☒  **(BY MAIL)**

19

    ☐ I deposited such envelope in the mail at Los Angeles, California. The envelope

20

was mailed with postage thereon fully prepaid.

21

    ☒ I am readily familiar with the business practice of my place of employment with respect to the collection and processing of correspondence, pleadings and

22

notices for mailing with United States Postal Service. The foregoing sealed envelope was placed for collection and mailing this date consistent with the

23

ordinary business practice of my place of employment, so that it will be picked up

24

this date with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of such business.

25

26

☐  **(BY OVERNIGHT COURIER)**    I am readily familiar with the business

27

practice of my place of employment with respect to the collection and processing of times for delivery by overnight courier. The foregoing sealed envelope was placed

28

for collection and overnight delivery by UPS this date consistent with the ordinary

1   business practice of my employment, so that it will be picked up this date with
2   delivery charges fully prepaid at Los Angeles, California, and delivered the
3   following business day in the ordinary course of business.

4   ☐   **(BY CM/ECF)**
5   Pursuant to CM/ECF System, registration as a CM/ECF user constitutes service
    through the Court's transmission facilities.  The Court's CM/ECF system sends an e-
6   mail notification of the filing to the parties and counsel of record listed above who
7   are registered with the Court's EC/ECF system.

8   ☒   **(BY ELECTRONIC MAIL) - COURTESY**
9   On the below date, I transmitted the foregoing document(s) by electronic mail, and
    the transmission was reported as complete and without error.  This method of
10  service was made as a professional courtesy to counsel.

11  ☒   **(FEDERAL)**   I declare under penalty of perjury that the foregoing is true and
12                      correct, and that I am employed at the office of a member of the
                        bar of this Court at whose direction the service was made.
13
    Executed on July 6, 2020, at Los Angeles, California.
14

15

16                                                  _Debbie Gutierrez_

17

18

19

20

21

22

23

24

25

26

27

28







UNITED STATES POSTAGE

PITNEY BOWES

02 1P
0000929198          JUL 06 2020

$ 003.20⁰

MAILED FROM ZIP CODE 90067

**GT** GreenbergTraurig

**Greenberg Traurig, LLP**
1840 Century Park East | Suite 1900
Los Angeles, CA 90067

RECEIVED

JUL 08 2020

Shaun Setareh, Esq.
William M. Pao, Esq.
SETAREH LAW GROUP
315 S. Beverly Drive, Suite 315
Beverly Hills, CA  90212